BW
USDC- GREENBELT
'23 JUN 22 PM 3:38

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Civil Division)

KARI L.D. FISHER )
K.F. )
  )
  )
    Plaintiffs, )    Civil No. TJS 23 CV 1693
  )
v. )
  )
  )
Prince George's County Public Schools, )
PGCPS Board of Education, )
Chief Executive Officer, Dr. Monica Goldson, )
Director of Special Education, Ms. Trinell Bowman )
Sasscer Administration Building )
14201 School Lane )
Upper Marlboro, MD, 20770. )
  )
  )    Jury Demanded
    Defendants. )
  )

## COMPLAINT

Plaintiffs Kari L.D. Fisher (Mother) and K.F. (Student) (collectively Plaintiff or

Student), for their Complaint against Chief Executive Officer (CEO) Dr. Monica Goldson of

Prince George's County Public Schools (PGCPS), Prince George's County Public Schools

Board of Education (Board), Special Education Director Ms. Trinell Bowman (and

successor(s)), from these and related organizations, collectively representing the Plaintiffs'

local school system (Defendant, Agency, or School System), respectfully allege and state as

follows:

**INTRODUCTION**

This education, civil rights and whistleblowing lawsuit seeks to remedy violations of

the hostile environment created and perpetuated by PGCPS, its officials, employees, and

agents, retaliation, discrimination, denial of a free appropriate public education (FAPE),

wrongful cessation of benefits under the IDEA, denial of due process, fraud and/or material

misrepresentations/omissions, and other unlawful actions and abuses to which K.F. (Student)

and Kari L.D. Fisher (Mother) (collectively Student) was subjected by and at Agency spanning

decades because of numerous protected bases, protected activities, and in violation of

numerous laws.  Rather than correct the hostile environment and cease discrimination,

retaliation, and other unlawful activities, including subjecting Plaintiff to adverse actions,

Defendant continued its unlawful conduct toward Plaintiff in retaliation and discriminatorily

for her advocacy and reporting of the incidents, as well as adverse actions and abuses within

the system and specifically targeted at Plaintiff, including interfering with Mother's

employment, reputation in the community, family, and personal life, as well as Student's

personal life and extracurricular activities.  With nowhere else to turn, Plaintiff has been

forced to resort to litigation.

**NATURE OF THE ACTION**

1.      Plaintiff brings this action against Defendant, representing the local public

school system, for subjecting them to a hostile environment, discrimination, retaliation, denial

of FAPE, denial of due process, equal access, education fraud and/or material

misrepresentations and omissions, adverse actions, and other unlawful acts, including by their

attorneys actions in Office of Administrative Hearings and other proceedings and interactions,

including on but not limited to the following actual, perceived, and/or rumored bases:  age

2

(YOB: 1971 and 2004), disabilities (physical, mental, medical conditions, disability stereotyping, caregiver of individual with disabilities), national origin/ancestry/ethnic background (Scandinavian/Germanic European/Other European/etc., stereotyping), race (Caucasian, stereotyping), sex (female, sex stereotyping, sexual orientation, caregiver of individual with disabilities), color (fair-complexioned/white, blue eyes, blonde hair, stereotyping), such as continuing violation doctrine, by Title VI of the Civil Rights Act of 1964; Title IX of the Education Amendments of 1972; Section 504 of the Rehabilitation Act of 1973; Age Discrimination Act of 1975; Title II of the Americans with Disabilities Act of 1990; the U.S. Constitution, including due process and equal protection; 42 U.S.C. § 1983; Individuals in Education Act, 20 U.S.C. § 1400 and § 1414, and equitable doctrines.

2.      As further detailed in their Prayer for Relief, Plaintiff seeks compensatory damages and punitive damages, among other damages and relief, to redress injuries suffered as a result of Defendant's unlawful harassment, discrimination, and retaliation committed, the denial of FAPE, the denial of due process, and other violations of law.

## PARTIES

3.      Student and Mother are female residents of Adelphi, Prince George's County, Maryland at 2508 Heatherwood Court, Adelphi, Maryland, 20783, and can be further reached at 301-996-8523 and karifisher7@gmail.com.  Defendant's physical address for executive operations where Student was enrolled in public school is PGCPS, Sasscer Administration Building, 14201 School Ln, Upper Marlboro, MD 20772.

4.      Defendant Chief Executive Officer Dr. Monica Goldson ("CEO Goldson") is named in her official capacity as the CEO of PGCPS and Board.  The contact information is 301-952-6000 and ceo@pgcps.org.   The contact information for Ms. Trinell Bowman, Special

3

Education Director for PGCPS is 301-952-6000, and trinell.bowman@pgcps.org. The PGCPS Board of Education contact number is 301-952-6000 and board.appeals@pgcps.org.

5. CEO Goldson is directly liable for the unlawful and discriminatory actions or omissions of her agents, servants, and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

6. Defendant is a local agency in the State of Maryland with central operations in Upper Marlboro, Prince George's County, Maryland, United States of America.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because most or all of the events or omissions giving rise to the claims occurred in the Prince George's County in the District of Maryland, and Defendant's principal place of business is in Prince George's County in Maryland.

## PROCEDURAL SUMMARY

9. On May 10, 2022, Student's Attorney filed a due process complaint (May 2022 Complaint) [MSDE-PGEO-OT-22-10884] to review the identification, evaluation, and placement of Student, and the provision of a free appropriate public education (FAPE) under the Individuals with Education Act (IDEA), raising the following issues and requested proposed remedies. See 34 § Code of Federal Regulations (C.F.R.) 300.507.[1]

a. ISSUES: (1) PGCPS failed to provide [Student] with a FAPE and failed to provide compensatory services; and (2) PGCPS failed to provide Kari with FAPE,

---

[1] This is a simplification of the procedural histories from the three due process complaints filed by Student.

during the COVID-19 pandemic school closures and subsequently and failed to offer sufficient recovery services.

b. PROPOSED REMEDY:  We request that the ALJ: (1) FIND PGCPS failed to provide [Student] with a FAPE and failed to offer appropriate compensatory and recovery services; (2) ORDER stay put regarding [Student's] upcoming graduation from PGCPS; (3) ORDER PGCPS to provide [Student] with an additional year of school services with placement in a private separate day school designed to address her unique disability related needs and other compensatory and recovery services.

10.    On August 15, 2022, Student's Attorney filed a Motion to Postpone at the Office of Administrative Hearings (OAH), for many meritorious reasons, including because Student and members of her family, had contracted COVID-19 and were very sick.

11.    On approx. August 17, 2022, Judge Henderson raised *sua sponte* the issue of whether the parental education rights of Mother transferred to Student when she turned 18, which was to be discussed at a hearing at the request of Judge Henderson.  The hearing was scheduled for August 24, 2022.

12.    On approx. August 19, 2022, without notice to Student, Defendant sent Judge Henderson a letter that made numerous intentionally highly inflammatory and prejudicial statements, perpetuating false/manufactured/disparaging narratives/material misrepresentations and/or omissions/mischaracterizations/etc. regarding extremely confidential, sensitive education records information that was manufactured illegally by Ms. Yaya Abangma and misused with the intent to prejudice the trier of fact,[2] and humiliate Mother and Student.

---

[2] Student formally requested that all letters, filings, and communications sent to Judge Henderson be made a part of the record because Defendant had not been copying the OAH Email Inbox.

13.     On August 21, 2022, Mother and Student, then proceeding *pro se,* filed a Supplemental Motion to Postpone for additional meritorious reasons.

14.     On August 23, 2022, Student filed a Motion to Amend the PCR to include the denial of FAPE and related claims through Student's 7th grade academic year, which was subsequently denied.

15.     On August 23, 2022, Student filed a Motion for Ruling on Subpoena Use by PGCPS and Extension of the Five-Day Discovery Deadline, which included a 5-Day Discovery Disclosure, listing, among others, Student and Mother, as witnesses.

16.     At the August 24, 2022, Hearing, which began at 4:30 pm, the collective Motion to Postpone was also considered with Defendant and Administrative Judge (Judge) Henderson.  Despite hearing testimony regarding the bases for the requested postponement, including for a reasonable accommodation and that Student was still very sick with COVID-19 (referred to as long COVID-19), Judge Henderson indicated that he would grant a postponement if Defendant agreed to it.  While Defendant's Attorney was granted his request to change the hearing dates in order to attend a vacation with his family, Defendant refused to agree to a postponement despite evidence that Student had been diagnosed with COVID-19 and that Student was still very sick with COVID-19.  Separately, Judge Henderson indicated that if Student was listed as a witness he would postpone the hearing without regard to PGCPS' refusal to agree to it; however, despite Student being listed as a witness and a party to the May 2022 Complaint, Judge Henderson denied Plaintiff's Motion for Postponement.[3]

---

[3] See U.S. Department of Education Guidance on long COVID-19 issued July 26, 2021, "Long COVID under Section 504 and the IDEA: A Resource to Support Children, Students, Educators, Schools, Service Providers, and Families."

6

17.     During the August 24, 2022, Hearing, Judge Henderson ordered Defendant to provide the information requested by Student on July 30, 2022, in their First Request for Document Production, including Student's Complete Student Records, because as of that date, Defendant had refused to honor Student's Request for Document Production, and in fact, filed a motion to have the Request for Document Production stricken.[4]

18.     Due to misconduct, discrimination, retaliation, and prejudicial actions with the trier of fact taken, including on August 25, 2022, and effective mistrial caused by Defendant as well as Student's physical and psychological health from COVID-19, reconfirmed in urgent care on August 25, 2022, Student was forced to withdraw the May 2022 Complaint without prejudice on August 25, 2022.

19.     Student filed a due process complaint on August 31, 2022, Complaint (August 2022 Complaint) to include the denial of FAPE and related claims through Student's 6th grade academic year.  [MSDE-PGEO-OT-22-21157]

20.     Student filed an amended due process complaint on October 17, 2022 (October 2022 Amended Complaint) prior to Defendant responding to Student's August 2022 Complaint and prior to the August 2022 Complaint being docketed and assigned to an administrative judge, to include the denial of FAPE and related claims through Student's 2nd grade academic year.

21.     Defendant did not file an answer or motion related to the August 2022 Complaint nor October 2022 Amended Complaint, until November 9, 2022, when it filed a Motion to Dismiss, or alternatively, Motion for Summary Decision (Motion to Dismiss). PGCPS' main assertions were that it was not required to provide IDEA benefits to Student

---

[4] As of August 26, 2022, when the May 2022 Complaint was officially withdrawn by OAH, Defendant had not provided documents to Student, and the Hearing on the Merits was scheduled to begin on August 30, 2022.

because it had issued her a diploma and that Student filed the August 2022 Complaint in bad faith.[5]

22.     Student filed a Motion to Compel Defendant to produce Student's Complete Student Records pursuant to the IDEA on December 6, 2022.

23.     Student filed an Opposition Reply to Defendant's Motion to Dismiss, which included a Motion for an Extension of Time to file a Supplemental Response to Defendant's Motion, on December 7, 2022.  Student also filed a Motion for Leave to Amend the August 2022 Complaint on December 7, 2022 (Final Amended Complaint 2023).

24.     Judge Andrews issued a letter to the parties on December 28, 2022, in relevant part stating:  1)  that he granted Defendant's request[6] to postpone the January 10, 2023, Hearing, and that it was rescheduled for February 21, 2023; 2) memorializing discussions during the December 21, 2022, pre-hearing conference, that: "[a]t this hearing, the parties will address the Motion to Dismiss or for Summary Decision filed by PGCPS on November 9, 2022.  At the Motion Hearing, I anticipate the parties will present any additional documentary or testimonial evidence and/or argument in support of or in opposition to the Motion."; and that the parties would have a pre-hearing conference on January 27, 2023, to go over any outstanding issues that needed to be resolved before the Defendant's Motion to Dismiss Hearing on February 21, 2023.[7]

_____

[5] Judge Andrews February 23, 2023, Decision ruled that Student did not act in bad faith when filing the August 2022 Complaint.  Although Student does not agree with some substantive portions of and statements made in the ruling, Student does not appeal this decision.

[6] Defendant's Attorney requested the postponement of the January 10, 2023, Hearing for a family vacation.

[7] This letter incorrectly suggests that Student maintained that the IDEA provided the exclusive procedures related to all aspects of a due process complaint; during the December 21, 2022, Hearing, Student acknowledged that the IDEA rules did not control every aspect of a due process hearing but was focusing on the OSEP POLICY LETTER 22-04: April 15, 2022 to Zirkel in regard to the U.S.D.E.'s position on what can dismiss a due process complaint, namely contesting the sufficiency of a complaint, and that summary judgment proceedings should not be used in due process hearings unless both parties agreed.  Student did not agree, and repeatedly made this objection throughout.

25.     On December 29, 2022, in light of the deferral of a ruling on the Motion for Leave to Amend filed by Student on December 7, 2022, Student filed a due process complaint (December 2022 Complaint) [MSDE-PGEO-OT-23-00349], which mirrored the Final Amended Complaint 2023.[8]

26.     On January 6, 2023, Judge Andrews ruled that PGCPS had to provide Student's requested records: "I conclude as a matter of law that PGCPS must permit the Parent to inspect and review any education records, as defined under FERPA, including copying such records, if necessary, related to the Student that was collected, maintained, or used by PGCPS and do so without unnecessary delay before any hearing under the IDEA. 34 C.F.R. § 300.613." However, these records were not provided to Student prior to the January 27, 2023, and January 30, 2023, Hearing on Defendant's Motion to Dismiss.

27.     On January 6, 2023, Judge Andrews issued a letter stating in part: 1) "I also find it appropriate to schedule a hearing on the merits of the Complaint."; and 2) "Finally, I have reconsidered whether holding a motion hearing on February 21, 2023, promotes the orderly and efficient resolution of this matter, which it does not. ***Accordingly, the parties should be prepared to address the Motion to Dismiss and or for Summary Decision on January 27, 2023.*** I will issue a ruling on the motion by February 21, 2023. At the prehearing conference [February 21, 2023], the parties should be prepared to discuss the scheduling of a merits hearing."

---

[8] On February 23, 2023, Judge Andrews ruled that the December 2022 Complaint was dismissed because its contents were contained in Final Amended Complaint 2023. Although Student does not agree with some substantive portions of and statements made in the ruling, Student does not appeal this decision.

9

28.     On January 6, 2023, Student filed a Motion for Leave to reply to Defendant's Limited Reply filed December 22, 2022, and sought clarification for the legal standards being applied to Defendant's Motion to Dismiss.

29.     On January 10, 2023, Student filed a Motion to Compel PGCPS to reply to Student's August 2022 Complaint.

30.     On January 13, 2023, Judge Andrews ruled to grant Student's Motion for Leave to Amend filed on December 7, 2022 (Final Amended Complaint 2023).

31.     On January 18, 2023, Judge Andrews requested to schedule a pre-conference hearing, which was held on January 23, 2023.

32.     On January 27, 2023, a Motion's Hearing was held to address Defendant's Motion to Dismiss.  Defendant presented one witness, a guidance counselor, and five exhibits, and rested its case.

33.     During the hearing, Student provided exhibits and a tentative list of witnesses, and stated that Mother, Student, Dr. Sarah Wayland, an expert witness, a representative from Riverview School, Student's current school, and Student's Grandmother were available to testify that day.  Judge Andrews excluded numerous of Student's exhibits from the record, including assessments and records from Student's current school, Riverview School, occupational therapy assessments, and education assessments conducted in 2022, etc.  By the time Student finished marking their exhibits, it was already late in the afternoon before Mother was able to begin testifying.  Mr. Krew, PGCPS Attorney stated during the hearing that if any of the assessments were taken for the truth of the matter asserted without having a witness to discus the reports, he would appeal.  During Mother's testimony, Defendant's attorney announced he needed to leave around 4pm to observe a religious practice beginning at

sundown.  Judge Andrews scheduled a continuance of the hearing to resume on Monday

January 30, 2023, and asked the parties to submit a statement of authorities regarding the

issuance of a high school diploma on FAPE, etc. to his personal work email address over the

weekend to submit the statement of authorities. On January 28, 2023, Defendant's Attorney

sent communications to Judge Andrews that did not involve the statement of authorities, but

instead, made numerous intentionally highly inflammatory and prejudicial statements,

perpetuating false/manufactured/disparaging narratives/material misrepresentations and/or

omissions/mischaracterizations/etc. with the intent to prejudice the trier of fact, similar to what

Defendant had done in the May 2022 Complaint with Judge Henderson on August 19, 2022.[9]

Student reported this behavior immediately to Judge Andrews.  In this communication to

Judge Andrews, PGCPS also requested to rely on other documents and to call 2 additional

witnesses, Ms. Yaya Abangma and Ms. Roslyn Turner from PGCPS.

     34.     On January 30, 2023, as the beginning of hearing that morning, PGCPS'

Attorney Mr. Krew read for Judge Andrews, despite having rested its case on Friday January

27, 2023, after presenting 5 documents, from a document Mother had not been made aware of

prior to filing the May 2022 Complaint, nor had she seen it or its contents, an alleged Child

Abuse and Neglect Form filled out by Ms. Roslyn Turner in February 2021, accusing Mother

of Child Abuse/Neglect for having a discussion about Student's disabilities with Ms. Turner,

presumably over zoom, during COVID-19 pandemic school closures in a calculated effort to

prejudice the trier of fact, have chilling effects on Student's efforts to bring the due process

case, to cause humiliation, destroy credibility, and so forth.

---

[9] Student formally requested that all letters, filings, and communications sent to the administrative judges
be made a part of the record because Defendant had not been copying the OAH Email Inbox.

35.     Mother, Student, Ms. Meghan Hammond from Riverview School, Student's Grandmother, and Dr. Wayland were available to testify.  However, Dr. Wayland was not available to testify until later in the afternoon.  Student explained that she could not subpoena witnesses, including those on the witness list she had submitted, because it was a motion's hearing.[10]  Student also submitted a few additional documents to be included in the record, which included the expert's CV and bio at the request of the Court.

36.     Despite Mother having not finished her testimony and having other witnesses yet to call, Judge Andrews ruled that Mother would not be able to finish testifying or allowed to call other witnesses, and that both parties were required to make their closing arguments during that time instead.  In addition, after Judge Andrews stated that no other documents could be sent, Defendant's Attorney sent Judge Andrews a document while Mother was talking during the hearing.

37.     As of the January 27, 2023, Hearing, that was continued into January 30, 2023, PGCPS had not provided Student's Complete Student Records pursuant to the January 6, 2023, Order by Judge Andrew.

38.     On February 23, 2023, Judge Andrews issued a ruling that held that Student met Maryland's requirements to receive a regular high school diploma and graduated from high school, and that Student was no longer entitled to a FAPE, and thus, any claim that a FAPE was deficient was moot.

## FACTUAL SUMMARY[11]

39.     Mother and Student are domiciled in Adelphi, Maryland.

---

[10] The witness list submitted by Student for the Motion's Hearing did not include all the witnesses that were expected to testify at the merits hearing to be scheduled for later in the winter 2023.
[11] Due to the voluminous nature of this case, Student is providing a summary overview of the facts, and would like opportunity to provide additional facts as the case proceeds.

40.     Student is an eighteen-year-old, twelfth-grade student chronologically, but not based on skill levels, whose home high school would be High Point High School in the Prince George's County Public Schools (PGCPS).  Student was moved to the Visual and Performing Arts (VPA) program for specialty music education for orchestra and viola at Northwestern High School (NHS) in 10th grade, the year of the COVID-19 pandemic, after attending the Center for Visual and Performing Arts (CVPA) for specialty music education for orchestra and viola at Suitland High School (SHS) in 9th grade and Kenmoor Middle School (KMS) Autism Program in 7th and 8th grade, the Paint Branch Elementary School (PBES) Autism Program in 3rd through 6th grade, the Beltsville Academy (BA) Autism Program in Kindergarten through 2nd grade, and Frances Fuchs Early Childhood Center (FFECC) Infants & Toddlers Program through Prince George's County from ages 2 through 5.

41.     Student is eligible for special education and related services under an Individualized Education Program (IEP) as a student with multiple disabilities but a primary disability coding of Autism.  See Individuals with Disabilities in Education Act (IDEA).  See also 34 CFR § 300.39 - Special education ("Special education means specially designed instruction, at no cost to the parents, to meet the unique needs of a child with a disability, including - (i) Instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and (ii) Instruction in physical education.")  Special education that has been characterized as "related services" on the IEP include but are not limited to speech services, occupational therapy, physical therapy/adaptive physical education, counseling, and assistive technology.  However, the IEP fails to properly categorize special education services and excludes other services that were required.

13

42.     Student was born with pervasive and severe developmental delays and has been in special education in PGCPS since age 2, when she entered the Infants and Toddlers Early Intervention Program for babies and toddlers through Prince George's County, Maryland at Frances Fuchs Early Childhood Center in Beltsville, Maryland, under the IDEA, Part C.

43.     Student's disabilities impact socialization, cognition, reading, oral and written language processing, social and pragmatic language, physical movements, including gross and fine motor, motor coordination and planning, emotions, psychological well-being, self-esteem, independent living skills, academic skills, comprehension, and other critical areas of development.

44.     Student was grossly victimized by many staff members at the direction of the Principal at her placement at the Autism Program at Beltsville Academy (BA) when she was 7 years old in second grade.  Child Protective Services had to intervene to move Student to a different autism program away from where she was abused, and she was then placed at the Autism Program at Paint Branch Elementary School in 3rd grade where she remained through the first year of middle school, 6th grade.  Student's family notified Child Protective Services and many PGCPS, public, and elected officials and representatives, agencies, as well as private entities and individuals, about the victimization in 2012 and filed a State Complaint at MSDE in May 2013 explaining the events, violations, and unlawful activities.  However, the extensive trauma of the events and related persecution for reporting it followed Student and her family for the rest of Student's enrollment in PGCPS through present.  Student and her family were tormented in retaliation by PGCPS (and its agents) for reporting the egregious victimization through present, and this has resulted also in the on-going, pervasive denial of a free appropriate public education (FAPE) to Student and other violations ever since.  Further, there is recently

14

discovered, previously unknown, information that the child abuse and victimization was even more widespread and pervasive.

45.     For years going back to Student's attendance at the Autism Program at Beltsville Academy, if not earlier, PGCPS repeatedly made misrepresentations, including regarding Student's critical independent life and academic skills, progress, achievement, disabilities, programs, services, training, instruction, etc., and failed to disclose statutorily required information, to make mandatory disclosures, and provide access to records.

46.     PGCPS failed to evaluate Student in all areas of suspected disability, and evaluations and special education services were not administered by trained and knowledgeable personnel as required, particularly involving a female student with an extremely complex case of autism and developmental history such as Student.  PGCPS did not have, and intentionally failed to obtain, the expertise necessary to identify, acknowledge, and address Student's disabilities in special education and related services and denied her a FAPE based on her individualized and unique needs stemming from her disabilities, including physical impairment.

47.     New evidence continues to emerge through present (for example, from the academic team at Riverview School and a new reading comprehension evaluation by Lindamood-Bell on June 1st and June 2nd, 2023, that Student has reading disabilities with comprehension and related skills in the less than .1 %, which means her reading comprehension skills are at the late 1st grade/early 2nd grade and in the 6-7 age range levels.  Thus, student stopped making reading comprehension progress around the time of the abuse at Beltsville Academy.  Student was formally diagnosed with a reading disability in October 2022.  It has been reported in medical articles that 84% of children who demonstrate the type of reading disability that Student has have autism.  Students must be evaluated in all suspected areas of

disability by school systems, and Student was not evaluated for a reading comprehension disability. This is just one example. See Draper v. Atlanta Independent School System, 518 F.3d 1275 (11th Cir. 2008). Student also has conditions that impact behavior that PGCPS failed to child find.

48.     Another example is when PGCPS refused to hold a placement meeting in Student's 8th grade school year when she attended the Autism Program at Kenmoor Middle School for 7th and 8th grade to determine an appropriate placement for Student, special education to be provided, length and type of programs and services needed (like academic and life skills training through age 21, transition plan, etc.), and also to discuss her goals after completion of her program(s). Without placement by the IEP Team, Student started 9th grade at Suitland High School with a 4-5 hour daily commute to and from school. Continuation of services, including transition services, through age 21 must be discussed and determined when a child turns the age of 14 in Maryland. At the beginning of the 9th grade school year, PGCPS sent communications to the effect of: since Student can play the viola in a music program, we are no longer required to provide special education services. Ms. Toni Brooks was involved with these actions on behalf of PGCPS, among others, including Dr. Monica Goldson and Dr. Gwendolyn Mason.

49.     An additional example involves when PGCPS maliciously and dangerously took away Student's special education bus and bus stop of 10 years (near her home) on the premise that she was attending CVPA, a performing arts program, at SHS, approx. 30 miles away from her home (and refused to let her attend the performing arts program at NHS 2.7 miles from her home) making her commute 4-5+ hours daily to and from school, and after numerous requests by Mother as well as State and County representatives to restore her special education bus and

bus stop, even communicating with Dr. Salman, the then State Superintendent at MSDE, Student's family reported the egregious child abuse to Child Protective Services after 6.5 months of Student suffering tremendously from the situation because of her disabilities, lack of skills, inability to navigate, handle the irregularity/no routine, etc. when putting her bus stop on a busy, dangerous state highway, where cars honked, slowed, and stopped at her mistaking her to be a prostitute because she was standing on the road waiting for the bus in the dark, and her mother, Mother, who always had to accompany Student at the bus stop, her pick up time was in the dark of the morning at 6:17 am but her school day didn't start at SHS until 8:30 am, the transportation department intentionally kept bus location and arrival information from Student and her family, she would frequently arrive home after 6pm at night, and often had to wait in temperatures below freezing while intentionally not being told by the Department of Transportation and/or because the bus purposefully turned off its tracking software that indicated the bus arrival time, which resulted in long wait times for the bus outside or in their vehicle on a dangerous state highway, like over an hour waiting in their vehicle in 18-degree freezing temperatures causing their car to overheat, lose heat, and substantial damage to the vehicle.

50.     Between 6th grade and 10th grade, Student attended four different schools: Paint Branch Elementary School in 6th grade, Kenmoor Middle School in 7th and 8th grades, Suitland High School in 9th grade, and Northwestern High School in 10th grade, which were spread out geographically throughout a large Prince George's County. For example, Kenmoor Middle School is approximately 15 miles from Student's home, near FedEx Field in Landover, and Suitland High School is about 30 miles from Student's home, near National Harbor. Student lives near the University of Maryland in College Park. Around the end of the 2nd quarter in

10th grade at her 4th school, NHS changed 5 of Student's classes/teachers, and then in the 3rd

quarter, PGCPS closed schools due to the COVID-19 pandemic.

     51.     Student's grades, course completion records, and transcript are not commensurate

with Student's testing and skill levels, and the earning of a high school diploma.  Over the last

decade or more, PGCPS has continued to engage in and implement questionable practices, not

been transparent and consistent with practices, etc. with the intent to misrepresent, including a

"good faith efforts" standard for grading and similar measures, discontinued standardized

testing, and not hired and/or retained qualified special education teachers, permanent and/or

qualified.  Student frequently did not have appropriate teaching staff, and was taught by

substitute teachers, or basically babysitters because Student was often assigned to work on

software platforms (like Khan Academy) in lieu of having an actual teacher conduct instruction.

Further, Student did not receive the education, training, and instruction, and a FAPE, nor have

skills commensurate with the diploma issued to her by PGCPS in violation of the Stay Put Order

request filed May 10, 2022 (see MSDE-PGEO-OT-22-108884), and thus Student did not meet

the graduation requirements of PGCPS and MSDE.  Student requested a Stay Put Order to

prevent PGCPS from taking further adverse administrative action with respect to her enrollment

status, including graduation, exit interview, access to Student's PGCPS Accounts, like gmail and

Google classroom, but PGCPS completely disregarded the Stay Put Order request, to

intentionally and wrongfully end her benefits under the IDEA.  PGCPS did not have

authorization, nor consent, to issue Student a high school diploma, which was contested by

Student.  Further, Student was 17 years old and younger at all times throughout the issuance of

the high school diploma.

52.     Student has at all times and is unequivocally contesting the issuance of a diploma by PGCPS on numerous grounds.  PGCPS cruelly tortured Student about graduation and other events reserved for seniors.  Whatever occurred with respect to the corrupt issuance of Student's diploma is evidence against PGCPS, including when it took actions to humiliate Student. Student's arguments include that PGCPS failed to provide a FAPE by improperly awarding Student a high school diploma and exiting her from special education at the end of the 2021-2022 school year, against Student's objection and in violation of a Stay Put request.  PGCPS intentionally and unilaterally terminated Student's benefits under the IDEA by issuing her a high school diploma, even though the issue of her graduation is part of a due process complaint and was subject to a Stay Put request.  See R.Y. v. Hawaii (D. Haw. Feb. 17, 2010).  In contrast to the IDEA, Student's high school diploma was not fully aligned with the State's academic standards, especially in light of Student's low reading and other scores.  Student had not met the standards of proficiency in basic skills, nor had student received instruction, accommodations, etc. necessary to receive a high school diploma and commensurate with the education that is supposed to accompany it, especially during COVID-19 school closures.  In sum, pursuant to § 300.102(a)(3)(i), Student has not received a regular high school diploma and remains eligible for special education through the end of the school year in which she turns 21 years of age.  See D.J., THROUGH his parent O.W., on behalf of a class of those similarly situated v. CONNECTICUT STATE BOARD OF EDUCATION, 2019 WL 1499377 (D. Conn. 04/05/2019).  See also Zobrest v. Catalina Foothills School District, 113 S. Ct. 2462, 246, n.3 (1993) (holding a student's claim presented a live controversy, notwithstanding the fact that he had graduated from high school and was no longer eligible for services under the IDEA).

19

53.     Student requested Stay Put in the Final Amended Complaint due to PGCPS' bad faith and unclean hands with respect to the withdrawal of the May 2022 Complaint and that PGCPS didn't honor the Stay Put request from the May 2022 Complaint.

54.     Student's high school transcript does not contain the required assessments necessary to issue a diploma.

55.     IDEA allows students to receive compensatory education and other relief after their eligibility under IDEA ends via graduation or aging out.  Compensatory education, etc. can be awarded for failure to provide a FAPE in academic years that occurred prior to being issued a diploma, compensatory education, etc. can be awarded for failure to provide an appropriate transition program and applied after a diploma has been issued, compensatory education services, etc. can be awarded to individuals who have aged out of IDEA benefits and are over 22, and so forth.  See, for just one of many cases in this area, Lester H. v. Gilhool, 916 F.2d 865, 873 (3rd Cir. 1990) (30 months of compensatory education post age 21).

56.     Before the end of the last school year, the State of Maryland was allocated around 2 billion dollars of federal funding, if not additional funds from other sources, for COVID-19 relief and recovery for schools and program serving K-12 and through age 21.  PGCPS was allocated the second largest distribution of these federal funds in the State of Maryland.  PGCPS otherwise receives education funding for students with autism and disabilities prior to the COVID-19 pandemic, and separate from funds distributed for COVID-19.  While other States and jurisdictions did not close their schools during the COVID-19 pandemic, did not require masks, did not require weekly COVID-19 testing, did not otherwise have disruption of in-person instruction, and/or students were provided accommodations, the State of Maryland and/or PGCPS required school closures, required students to wear masks, implemented other measures

that disrupted in-person instruction, and/or did not provide accommodations to students through present. Instrumental music education was also effectively discontinued and created tremendous hardship and trauma on Student during this time.

57. Compensatory, recovery, declaratory, and other remedies are to address these failures by PGCPS by however many years back necessary to make Student whole. However, Student should have been in non-public placement by 2nd grade, if not earlier, with placement through age 21, as the IDEA provides for special education through age 21 for Student for her FAPE. Four years of additional instruction were expressly requested, as well as additional remedies, including to continue past age 21 to make Student whole, that is, where she should have been all along receiving the required special education and related services mandated by the IDEA. In addition, it is contemplated that remedies entail that PGCPS be ordered to provide the in-class academic and other instruction it failed to provide to Student when it denied a FAPE during the recovery, compensatory, and other remedial periods going back to prior years beginning in 2nd grade, if not earlier. Available remedies are not capped by the IDEA's two-year statute of limitations, and remedies are intended to make the student with disabilities whole under the IDEA. See, for example, G.L. v. Ligonier Valley School Dist. Authority, 802 F.3d 601 (3rd. Cir. 2015). Further, in this case, the statute of limitations is tolled due to specific misrepresentations and failure to provide statutory mandatory disclosures.

58. PGCPS' failure to provide appropriate special education and related services before, during, and subsequent to the COVID-19 pandemic school closures and other disruptions in instruction resulted in stagnant development as well as significant regression in Student's academic, social pragmatic skills, and independent living skills, which were already pervasively below grade level prior to the COVID-19 pandemic and behind. Due to the failure to provide

Student a FAPE for many years, including failure to child find, not provide appropriate placement through age 21, four additional years of school services through the age of 21 and other instruction, training, and services to address failures prior to, during the COVID-19 pandemic, and subsequently as compensatory and recovery services were requested. PGCPS has denied this request.

59.      Because new information continues to be discovered, 20 U.S.C. § 1415(f)(3)(D) of the IDEA is invoked, which provides for two equitable tolling exceptions to the statute of limitations: specific misrepresentations by the school district and the withholding of statutorily mandated disclosures. PGCPS made specific misrepresentations and withheld statutorily mandated disclosures going back many years. For example, Student was tested at Lindamood-Bell (LMB) in June 2022 (and June 2023) because PGCPS had suggested the service for her. However, upon having Student assessed at LMB, it was discovered that Student's reading skills were so far behind that she is in the early elementary school range reading level at best and that her skills require such extensive remedial intervention that Student was not eligible for the group reading therapy sessions PGCPS was offering to other students over the summer at PGCPS facilities provided by LMB. Instead, LMB informed Mother that after one full year of intensive LMB 1-on-1 sessions every day for 6 hours a day at a LMB facility, that Student might achieve middle school reading levels. Thus, based on equitable tolling permitted by 20 U.S.C. § 1415(f)(3)(D), compensatory, recovery, declaratory and other periods should be extended to go back to August 2011 at the beginning of Student's 2nd grade year, if not earlier.

60.      PGCPS stated during a resolution meeting involving matter OAH No. MSDE-PGEO-OT-22-21157 on October 13, 2022, that PGCPS staff had just reviewed Student's entire school records. However, PGCPS had failed to respond to several requests from Student for her

complete Student Records through various official means through the Motion's Hearing date (through present) and provide her a copy her own complete student records, despite Judge Andrew's granting of Student's Motion to Compel on January 6, 2023.

61.     Relevant data and evidence comprises of proposed and in effect IEPs, draft IEPs, and Prior Written Notices (PWNs), including but not limited to assessments, other testing, communications and events, that occurred in the following timeframes through present, Student's chronological 2nd grade year at Beltsville Academy, 2011-2012 school year, Student's chronological 3rd grade year at Paint Branch Elementary School, 2012-2013 school year, Student's chronological 4th grade year at Paint Branch Elementary School, 2013-2014 school year, Student's chronological 5th grade year at Paint Branch Elementary School, 2014-2015 school year, Student's chronological 6th grade year at Paint Branch Elementary School, 2015-2016 school year, Student's chronological 7th grade year at Kenmoor Middle School, 2016-2017 school year, Student's chronological 8th grade year at Kenmoor Middle School, 2017-2018 school year, Student's chronological 9th grade year at Suitland High School, 2018-2019 school year, Student's chronological 10th grade year at Northwestern High School, 2019-2020 school year, Student's chronological 11th grade year at Northwestern High School, 2020-2021 school year, Student's chronological 12th grade year at Northwestern High School, 2021-2022 school year, Student's enrollment through the date of the Motion's Hearing at Riverview School for the 2022-2023 school year, some of which is summarized below, and now through present.

62.     For example, transition activities noted in the IEPs from 2017 to 2022 indicated academic goals to include completing vocational assessments and interest inventories.  In addition, there were employment training goals to include taking the PSAT, SAT, ASVAB, etc., participating in a transition fair, and "participating in career exploration options such as job

shadowing experience, apprenticeships, internships, volunteer experiences, paid employment, etc."; however, these goals were not followed and Student did not participate. Further, these goals were not appropriate; for example, the SAT, PSAT, etc. indicates a student who has the abilities and readiness to attend college and the commensurate reading comprehension skills, etc.

63.    From 2006, when Student entered PGCPS at the age of two at Frances Fuchs Early Childhood Center through June 23, 2022, while attending PGCPS, Student was not allowed to be alone in the parking lot at school, or wait for buses, wait for her family to pick her up, get on the buses, etc. without adult supervision by PGCPS at PGCPS facilities at all times because she does not have the critical independent life skills necessary to do this independently, including not having a sense of stranger danger.

64.    At the end of her first grade year, Student's Approved IEP dated April 13, 2011, reports DRA (Developmental Reading Assessment) levels from testing done in April 2011, indicating that her comprehension scores were adequate for a student in their fourth quarter of first grade. In March 2011, her classroom math assessments showed that her math was on grade level. She was a good speller, but she had difficulty properly capitalizing words. She had trouble properly articulating /t/, /k/, /d/, and /g/. She was learning to understand prepositions, and word categories (e.g., "an orange is a fruit"), and to answer WH-questions. She used "simple phrases of negation, of commands, or of request" with her peers. Handwriting was messy at home, but appropriate at school; gross motor skills were delayed. Her IEP goals targeted reading comprehension, math skills (addition, subtraction, telling time), articulation of /k/ and /g/, understanding cause-effect relationships, and answering WH-questions. She also had goals relating to conversational turn-taking, interacting with other children, and throwing a ball.

Services included 20 hours in special education classroom each week, and five 30-minute speech-language sessions each month.

65.     In second grade, Student's final approved IEP, dated June 15, 2012, noted many of the same challenges. Reading comprehension was poor; she still struggled with cause-effect and summarization, while her spelling/decoding skills were excellent.  Math was on-level for her grade. She was learning to say /k/ and /g/, but still substituted /d/ for /g/.  WH-questions continued to be challenging for her to answer, and her ability to converse with peers was improving, but still well-below grade level. She had trouble with writing, though the OT report said her palmar pencil grasp was "functional". Gross motor skills remained significantly delayed.

27.     The IEP goals for the 2012 IEP targeted skills in reading comprehension (using a graphic organizer to assist in summarizing and identifying the main point) and math calculation (3-digit addition and subtraction, clock skills and vocabulary related to probability). Her speech articulation goals (/k/ and /g/ sounds), receptive language goals (cause/effect relationships and WH-questions), expressive language goals (conversational skills), social interaction goals, and gross motor skills were the same as the previous year.  She continued to require speech-language services (though the time was reduced to four 30-minute sessions each month) and her time in special education classes was reduced to 10 hours a week.

66.     When given the Woodcock-Johnson III Tests of Achievement (WJIII) on 10/9/2012  Student received a Broad Reading score of 115, which is in the high average range, with a subtest score of 95 on the Passage Comprehension subtest (average). On the Story Recall Delayed subtest Student scored a 39 (in the very low range) and her Story Recall score was a 73, which is in the low range.  On the Broad Math battery of the WJ-III, Student scored a 104

(average range).  On the Calculation subtest Student scored a standard score of 102.  On the Math Fluency subtest Student scored 105.  On the Applied Problems subtest, she got a standard score of 105.  Her Broad Writing scores were not reported, though she was listed as being at a 4th grade instructional level.  Student was given a TGMD-2 (Test of Gross Motor Development - 2nd Edition) on October 16, 2012, and scored in the 8th percentile for girls her age, with significant gross-motor challenges.

67.     In 2013, Student was assessed at Kennedy Krieger Institute (KKI) for speech-language and occupational therapy.  Her parents submitted the reports to the IEP team asking them to consider updating her goals and services to address the findings of the KKI team.  The IEP Team reviewed the reports, along with Student's educational history including grades, classroom assessments, state standardized assessments, teacher observations, occupational therapist observations, and speech language pathologist records, and decided that the goals and services in the IEP did not need to be changed but Student's parents disagreed.

68.     In 2014, the final amended IEP, dated 1 April 2014 awarded special education services including six 30-minute speech-language sessions per month, 30-minutes adapted PE per quarter, and special education delivered in the general education classroom co-taught by a general education teacher and a special education teacher.  When administered the Math MUST 1 during the 2013/2014 school year, Student scored in the Advanced range, but her score on the English and Language Arts MUST 1 was in the Basic range. Her score on the Scholastic Reading Inventory (SRI) was 410, in the at risk range. Her teacher noted that she had difficulty explaining or summarizing passages in her own words, as well as difficulty in drawing inferences. This included challenges identifying and explaining relationships between characters, setting, and events.  Despite these challenges, she was reported to be on grade level in writing.

Her speech scores improved dramatically, and she performed in the average range (standard score of 90) on the Goldman Fristoe Test of Articulation. Her receptive language was still impaired, and she continued to struggle with making Inferences and drawing conclusions about what she had read. She had difficulty making predictions, understanding idiomatic expressions, and answering why questions. She continued to struggle with spoken language pragmatics, perfectionism, and executive functioning (like writing assignments in her agenda book). Student's academic skills, specifically her reading comprehension, writing, and social skills continued to be impacted. She received instruction on modified grade-level content.

69.    Her IEP goals were unchanged for Reading Comprehension. Her writing goal was to get her to use prewriting techniques to organize her thoughts, and limit her written answer to address only the question she had been assigned. Her receptive language goals included learning to make inferences, draw conclusions from text, and interpret figurative language. Her expressive language goals targeted summarizing information. Social-emotional work targeted reflecting on her interactions with peers and adults. She was also to work on self-management in the classroom. Her gross motor skill goal remained the same – to throw a tennis ball.

70.    Student's Triennial Evaluation dated November 16, 2015, reported Woodcock Johnson III Achievement Standard Scores largely in the average range, with above average scores in Broad Math, Math Calculation, and Academic Skills. Her language skills were assessed using the CASL (Comprehensive Assessment of Spoken Language), which revealed average scores in most areas except language pragmatics, where she scored in the very low range (Nonliteral Language (70), and Pragmatic Judgment (51)). Her IQ, as assessed by the WISC -IV fell in the average range of functioning (92), with superior short-term memory (WMI

27

= 120) and an average ability in nonverbal reasoning (PRI =96).  In comparison, she exhibited

relative weaknesses in verbal reasoning abilities (VCI =83) and processing speed (PSI =83).  On

the Naglieri Nonverbal Ability Test (NNAT), Student demonstrated average cognitive abilities

in nonverbal reasoning and nonverbal problem solving, with her Nonverbal IQ of 109.

71.     The amended IEP dated February 18, 2016, set goals and objectives in the areas

of reading comprehension, written language content, speech and language (receptive,

expressive), social-emotional/behavioral, and gross motor.  There were no goals targeting self-

management, even though the present levels reported, "… she needs reminding to stay on task,

complete her work, and not daydream.  She needs to take on more responsibility for her daily

activities like writing down her homework, getting her work completed and checked, going to

the bathroom or other activities."  Special education services were set for two (2) hours, five (5)

days per week, inside general education (IGE), and five (5) hours, four (4) days per week,

outside the general education setting (OGE).  She was also set to receive speech services OGE

for thirty (30) minutes, six (6) times per month, occupational therapy OGE for thirty (30)

minutes once a month, and adapted physical education IGE for thirty (30) minutes once a

quarter.  Student was also to receive a number of accommodations including frequent breaks,

extended time, visual supports, chunking of text, additional processing time, adult support,

social skills training, a dedicated aide, and monthly OT consultation.

72.     The next Triennial Evaluation dated October 18, 2018, reports Woodcock

Johnson IV Achievement Standard Scores largely in the average range, with below average

scores in Passage Comprehension and Sentence Writing Fluency, and above average scores in

Spelling, and Writing Samples.  On the Clinical Evaluation of Language Fundamentals – 5th

Edition (CELF-5), Student's receptive and expressive language skills fell in the low range with

particular weaknesses in short-term auditory memory, comprehension, organization, summarization, and grammatical concepts.  Her performance on the Pragmatics Profile checklist from the CELF-5 revealed weaknesses in nonverbal communication skills.  In an OT Evaluation dated October 22, 2018, the assessor noted that "Student's functional school participation is primarily limited by her deficits in decreased executive functioning skills, emerging self-help and socialization skills. These areas impact her self-management skills throughout the school day."

73.     The amended IEP dated November 12th, 2018, while Student was new to SHS in 9th grade, set goals and objectives in the areas of reading comprehension, written language content, speech and language (receptive and expressive), social-emotional/behavioral.  There were no goals targeting self-management.  Special education services were reduced to one (1) hour thirty (30) minutes, five (5) days per week, IGE.  Special education OGE was removed.  Her speech services were reduced to thirty (30) minutes, three (3) times per month OGE, and occupational therapy and adapted physical education were also removed.  Student was also to receive a number of accommodations, including copy of teacher/student notes, checks for understanding by having Student repeat or paraphrase information, repetition of directions, frequent breaks, extended time (double), visual supports, chunking of text, monitor use of agenda book, additional processing time, extra time for movement between classes, additional adult support, and a monthly OT consultation.  Social skills training and the dedicated aide were removed as services.

74.     The IEP dated October 30, 2019, after Student was transferred and new to NHS for 10th grade, set goals and objectives in the areas of communication, reading comprehension, written language content, and self-management.  Student was set to receive five (5), one (1) hour

and thirty (30) minutes of special education services in general education (IGE) each week; three

(3), thirty (30) minute sessions of speech therapy OGE each month, and transportation.

Supplementary aids and services for Student included:  allowing use of laptop for assignments

requiring extended writing; providing student with copy of student/teacher notes; having student

repeat and/or paraphrase information; repetition of directions; frequent breaks; extended time;

visual supports; chunking of text; monitoring use of agenda book and/or progress report;

additional processing/wait time; allowing extra time for movement between classes;

speech/language pathologist consult; additional adult support (1:1 assistance for arrival,

transition, and dismissal during school, getting on and off bus, and throughout the instructional

day); and occupational therapy consult.

      75.    In March 2020, schools closed due to the COVID-19 pandemic.  Closing its

doors to in-person learning has had catastrophic impact and caused tremendous devastation to

Student, imposing undue hardship and impacting her development, skills and progress in every

capacity.  She also suffered substantial regression and lost skills as well as severe psychological

trauma from the isolation and ineffective instruction, discontinuation of services, etc. resulting

from "virtual" school.  Student was already struggling from transitioning to an abrupt adjustment

to a new school, her 4th school since 6th grade, and changes in 5 of her classes at NHS right

before COVID-19 pandemic school closures.

      76.    On April 2, 2020, Mother received the Individual Continuity of Learning Plan

(ICLP) for the school closure. The ICLP was to address the reading comprehension, written

language content, and communication goal (which stated only "speech goals are embedded" in

both the IEP and ICLP).  Student was supposed to receive her special education via online

lessons with special education supports, phone consultation with parent, online meetings with

students, teachers, and parent, for only 30-45 minutes per week.  For related services, she was to receive her speech consult three times per month and OT consult once per quarter.

77.     In a Draft IEP dated October 22nd, 2020, the speech language pathologist, D.J. Watkins, recommended that speech language therapy services be removed from Student's IEP. The present levels of performance noted that evaluation data was based on the CELF, but provided no scores, and only reported observations from teachers.  A subsequent speech-language evaluation conducted by Stepping Stones Therapy on April 7 and April 14, 2021, noted that Student Fisher's core language skills were very low, with her receptive language at the 8th percentile, expressive language at the 9th percentile, language content at the 2nd percentile, and language memory at the 10th percentile.

78.     The amended IEP dated January 25, 2021, set goals and objectives in the areas of reading comprehension, social-emotional, and self-management.  Special education services were set for one (1) hour and thirty (30) minutes, five (5) days per week, IGE.  She was also set to receive speech services OGE for thirty (30) minutes, three (3) times per week.  The basis for this decision states, "Student requires intensive pragmatics support and will receive speech services outside of general education, and consultative occupational therapy that will be provided in a small setting outside of general education."  Student was also to receive a number of accommodations including have her repeat or paraphrase information, provide student with copy of student/teacher notes, repetition of directions, allow use of laptop for assignments requiring extended writing, extended time, frequent breaks, visual supports, allow extra time for movement between classes, chunking of text, occupational therapy consult, speech/language pathologist consult, additional adult support (1:1 assistance upon arrival, transition, and dismissal, getting on and off the school bus, and throughout the instructional day for mobility

and organization), monitor use of agenda book and/or progress report, and additional

processing/wait time.

79.     In April 2021, Student received a private speech language assessment with Beth

Ciangiulli, MA, CCC-SLP. On the Clinical Evaluation of Language Foundation (CELF-5),

Student scored as follows: Index Scores: Core Language Standard Score (SS) 79, 8th percentile;

Receptive Language Index SS 79, 8th percentile; Expressive Language Index SS 80, 9th

percentile; Language content index SS 69, 2nd percentile; and Language memory index SS 81,

10th percentile; Subtest Scores:  Word classes 9, 37th percentile; Following directions 4, 2nd

percentile; Formulated sentences 10, 50th percentile; Recalling sentences 7, 16th percentile;

Understanding spoken paragraphs 3, 1st percentile; Word definitions 6, 9th percentile; Sentence

assembly 3, 1st percentile; Semantic relationships 7, 16th percentile; Pragmatics profile (teacher

report) 3, 1st percentile; Pragmatics profile (parent report) 1, 0.1st percentile; Reading

comprehension 3, 1st percentile; and Structured writing 1, 0.1st percentile. On the Test of

Problem-Solving Adolescent, Student scored in the 0 percentile for all areas, demonstrating that

Student has "weakness processing and interpreting information and lacks the divergent thinking

skills necessary for academic success." On the Gray Oral Reading Test (GORT-5), Student

scored: Rate SS 13, 84th percentile; Accuracy SS 7, 16th percentile; Fluency SS 10, 50th

percentile; Comprehension SS 3, 1st percentile; and Oral Reading Quotient SS 81, 13th

percentile. Ms. Cianguilli summarized, "It's apparent that Student is not able to process

information that she's reading, regardless of the fact that her decoding skills are intact. Reading

comprehension impacts all academic subjects and is necessary for academic success. An

evidence based comprehension program, such as the Lindamood-Bell Visualizing and

Verbalizing program, is recommended to help improve Student's reading comprehension and to

32

close the gap between her decoding and comprehension skills." Overall, Ms. Ciangiulli

recommended speech language therapy three times weekly.

80. In May and June 2021, Student received a private psycho-educational evaluation

with Jennifer Nail, Ph.D.  Student's test scores were as follows: Wechsler Adult Intelligence

Scale: Verbal Comprehension Index 74, 4th percentile (Very Low); Perceptual Reasoning Index

79, 8th percentile (Very Low); Working Memory Index 77, 6th percentile (Very Low);

Processing Speed Index 76, 5th percentile (Very Low); Full Scale IQ 72, 3rd percentile (Very

Low); General Ability Index 74, 4th percentile (very Low). Wechsler Individual Achievement

Test- 4th Edition: Reading comprehension Standard Score (SS) 58, 0.3rd percentile (Impaired);

Word reading SS106, 66th percentile (Average); Reading composite SS 80, 9th percentile (Low

Average); Pseudoword decoding SS 102, 55th percentile (Average); Oral Reading Fluency SS

87, 19th percentile (Low Average); Spelling SS 115, 84th percentile (High Average); Receptive

vocabulary SS 84, 14th percentile (Low Average); Oral discourse Comprehension SS 56, 0.2nd

percentile (Impaired); Listening Comprehension Composite SS 66, 1st percentile (Impaired);

Expressive vocabulary SS 75, 5th percentile (Very Low); Numerical operations SS 82, 12th

percentile (Low Average); Math problem solving SS 87, 19th percentile (Low Average); Math

composite SS 83, 13th percentile (Low Average); Math fluency composite SS 103, 58 (Average)

(in average range for all math fluency subtests). For the Oral and Written Language Scales, and

the Social Language Development Test, Student scored in the Impaired range in all areas. On the

Developmental Test of Visual Motor Integration (VMI): Visual motor integration 45, <1st

percentile (Impaired); Visual Perception 98, 45th percentile (Average); and Motor coordination

62, <1st percentile (Impaired). On the Wide Range Assessment of Memory and Learning:

Verbal Memory Index 55, 0.1st percentile (Impaired); Visual Memory Index 55, 0.1st percentile

(Impaired); and Attention/Concentration 85, 16th percentile (Low Average). On the D-KEFS, "She showed a good ability to identify simple visual targets, illustrating her capacity for concrete, rule-based tasks that allow her to focus on one activity at a time. She was overwhelmed by tasks that required simultaneous processing, such as following multiple rules to create visual designs and switching between different rule sets." On the Behavior Rating Inventory of Executive Function, Mother "endorsed more concerns on the Cognitive Regulation index, which assesses skills that are important to academics." Inventories were also sent to teachers but were not returned to Dr. Nail., to which there is now question if PGCPS ordered staff not to provide the forms to Dr. Nail as evidence has emerged that occurred for Student's recent assessment. Overall, Dr. Nail recommended an educational environment that specializes in youth with autism spectrum disorder and therapeutic services throughout the school day; strategies to support attention and impulsive responding; tasks presented in small chunks; instructions and interventions including a strong visual component; multisensory approaches to address her developing math, reading, and writing skills; as much time as needed to complete assessments or independent work (and no timed components in progress monitoring); support in exploring her vocational interests and skills; clear, direct, and brief communication from teachers; opportunities for structured and unstructured social opportunities; and continuance of her music education through high school and beyond. Student should have had travel training and other life skills training based on her inability to cross the street alone, and PGCPS' knowledge that Student had been accepted into Metro Access. This is another example of a failure to child find.

81.     The 4th quarter resumption to in-person instruction to 2 days a week based on student's last names during the 2020-2021 school year, Student's chronological 11th grade

school year, presented its own disastrous effects on Student's access to a FAPE, etc. Returning

to school after the PGCPS schools partially opened was also a denial of a FAPE, with severe,

continued disruptions of in-person and virtual learning. Student requested a reasonable

accommodation that she be allowed to return to school for 4 days a week in the 4th quarter given

her disabilities, etc. (there was no in-person school on Wednesdays), but PGCPS intentionally

stalled, etc. in responding, despite numerous requests from Mother. After emailing the Board of

Education, etc. PGCPS finally allowed Student to return to school 4 days a week (regardless of

the spelling of her last name) toward the end of the 4th quarter, but Ms. Trinell Bowman

expressly told Mother a reasonable accommodation was not being provided. In the 4th quarter,

Student was typically the only student in her classes in-person, like in her English 11 class, she

was the only student who returned to in-person learning. While at NHS physically, Student sat

at a desk by herself every day for almost all her classes, if not all, while the teachers were facing

their school laptops to teach to the rest of the students in the class who were still attending

school virtually from home.

82. In August 2021, Student requested an IEP meeting with NHS to discuss non-

public placement and additional instruction. Also in August 2021, Student's attorney spoke with

PGCPS General Counsel about pursuing non-public placement, etc. PGCPS proceeded to

intentionally engage in stall and other tactics in bad faith to deny a FAPE, avoid non-public

placement and additional instruction, sabotage efforts to obtain a FAPE, avoid providing

compensatory and recovery services, and deny fair treatment, equal access, and due process.

83. During the 2021-2022 school year, Student did not have a case worker handling

her IEP, nor was a designated aide available throughout the school year in her classes. Student

had one special education teacher, in English 12, and had numerous substitute teachers

throughout the year in other classes, including in math class, among other many serious failures regarding Student's FAPE.

84.     One example of denying a FAPE in the 2021-2022 school year, with respect to the entire past academic year where Mother was trying to meet with the IEP team regarding non-pubic placement for Student and additional instruction and training, PGCPS staff intentionally bullied Student, intentionally stalled IEP meetings, rejected her private assessments intentionally to cause further delays, tested student without permission, stalled progress with their own assessments after testing, etc. to prevent Student from receiving special education and services that were required under the IDEA, including obtaining non-public placement and additional education, kept pushing Student to focus on college, constantly made her aware of and pushed graduation deadlines, events, etc. on her, pulled her from instruction and forced her to work service hours at school to have as a graduation marker despite her mother's express direction not to work service hours at school, sent many, many emails to Student about prom, graduation, photos, senior packages, t-shirts, had her attend graduation events at school, stand up in front of an auditorium of seniors and say in front of a room full of students and staff what her plans for the next year were for which she had to say in complete humiliation because NHS forced her to go on the stage:  she was going to continue high school next year, brought her a senior prom cup after prom as a souvenir that she did not attend (Student's physical disabilities make dancing extremely challenging, she does not have the ability to move her hips, etc. to dance), talked to her to about using school instruction time to have her apply to college, initiated conversations with Student to perpetuate a false narrative that Student's  mother was preventing her from graduating and that she should resent her mother and those efforts because PGCPS told Student that she had the skills to go to college right away, purposefully tried to create and foster tensions

between Student and her mother, including making statements that ambushed her mother's relationship with Student, coerced Student into believing that her mother was not acting in Student's best interest in trying to get her a critically needed years of additional academic and critical life skills instruction and training that PGCPS failed to provide, especially during COVID-19 school closures and other education disruptions through June 23, 2022.  Mother has written Governor Hogan, copying numerous public officials and offices, non-profit organizations, and many others about Student's situation specifically since April 2022.  PGCPS abused its police power, discretion, authority, wasted funds, emotionally and psychologically engaged in mind control and abuse over Student as a minor with autism and severe language and other disabilities, and has engaged in these types of violative, heinous actions against Student (and her mother) for over a decade.

85.     In September and October 2021, Student was evaluated at Kennedy Krieger Institute (KKI) through the Center for Autism and Related Disorders (CARD), where she has been seen since 2008, so that she could try to access therapies and other services through providers affiliated with her insurance.  Student received assessments in speech, occupation therapy, a psychological evaluation, and social work report in fall 2021 from KKI, and later, a physical therapy evaluation in summer 2022.

86.     In approximately November 2021, Student was rejected from a social skills group therapy PEERs program for teenagers with autism and other disabilities because her language skills were too far behind.  Social skills therapy is considered an aspect of Applied Behavior Analysis designed for individuals with autism.  Mother was looking for these support services for critical life skills to enroll Student because PGCPS failed to provide them.

87.     In November 2021, Student was offered a seat midway in a Life skills group

therapy class through KKI conducted by a speech-language pathologist and occupational

therapist at KKI and enrolled.  Life skills therapy is considered an aspect of Applied Behavior

Analysis designed for individuals with autism.  Mother was looking for these support services

for critical life skills to enroll Student because PGCPS failed to provide them.

88.     On November 23, 2021, the IEP team convened to discuss reevaluation and

assessments. Mother had sent the outside assessments from Dr. Nail and Ms. Cianguilli to the

school. Despite having these reports for months, the school team rejected the assessments citing

"The outside assessments has conflicting data from previous standardized assessments."  The

school team also expressed concern that Dr. Nail's assessment did not include information from

the teachers, despite the fact that inventories were sent to the teachers and were never returned.

However, the school may have prevented the teachers from filling out the forms, as it did for the

October 2022 evaluation issued by NeuroBehavioral Associates.  Despite knowing that Student

was seeking outside non-public placement and additional instruction and training, the school

team insisted on conducting its own triennial reports.  Ms. Yaya Abangma, a PGCPS

psychologist, spearheaded the IEP's decision to reject Student's outside assessments, even

though PGCPS had yet to begin any assessments of its own, and the triennial IEP meeting

should have occurred prior to November 23, 2021, thus causing further, unnecessary delay and

irreversible harm to Student.

89.     On December 9, and 13, 2021, Student participated in a PGCPS Qualitative

Reading Assessment (QRI-5). On word lists, Student scored 90% (upper middle school word

list) and 95% (high school word list). On passage comprehension, Student scored as follows:

High School Passage Comprehension

• Level - Frustration Without Look Backs (based exclusively on memory): Explicit- 0/5 Implicit- 0/5

• Level - Frustration With Look Backs (referring back to the text): Explicit- 1/5 Implicit- 0/5

• Level - Instructional With Look Backs (referring back to the text) and Prompting (The text examiner requested that she add more information or look in a specific part of the text): Explicit- 3/5 Implicit- 4/5

Fifth Grade Passage Comprehension

• Level - Instructional Without Look Backs (based exclusively on memory): Explicit- 2/4 Implicit- 4/4

• Level - Independent With Look Backs (referring back to the text): Explicit- 4/4 Implicit- 4/4

Upper Middle School Passage Comprehension

• Level - Frustration Without Look Backs (based exclusively on memory): Explicit- 0/5 Implicit- 1/5

• Level - Instructional With Look Backs (referring back to the text): Explicit- 4/5 Implicit 3/5

90.     On December 7, and 21, 2021, Student received a PGCPS occupational therapy (OT) assessment.  An Informal Occupational Therapy Assessment Administered by Nakeia B. Ervin, OTR/L, MHA/ and Tigisti Abraha, OTR/L on December 21st, 2021 noted, "Student's challenges with organizational skills impact her ability to manage assigned tasks and responsibilities, such as ensuring that she has submitted her work. Failure to keep track of her assignments and whether she has followed procedures to turn them in can negatively impact her

grades and cause an inaccurate view of her performance and abilities. … She often requires

additional prompting to stay organized and consistently submit her coursework.  It was also

noted that while Student generally does well with her academics and school routines, her self-

management skills outside of the school setting present to be limited.  Student will benefit from

strategies and supports to optimize her independence with her organizational skills to ensure that

she can manage tasks and routines with reduced support."  The OT recommended that the IEP

team consider OT as a related service for Student.

        91.      On dates in December 2021, Student received a PGCPS psychological evaluation.

A psychological evaluation by Yaya Abangma, MA, CAS, NCSP dated December 9th, 2021,

included data that Student's Verbal Intelligence Index was 71 (moderately below average),

Nonverbal Intelligence Index was 44 (significantly below average), Composite Memory Index

was 53 (significantly below average), and Speeded Processing Index was 101 (average).  Her

emotional functioning as indicated by the BASC-3 indicated that Student may have depressive

and anxious symptoms that manifest as sadness or irritability, as well as physical symptoms

related to sleep, appetite, fatigue, and aches/pains.   Ms. Abangma refused to report her findings

in her evaluation, stating:  "Due to variability across index scores, this examiner will not report a

summary estimate of intelligence or Composite Intelligence Index (CIX) score.  Student's

impulsive response style as well as a self-report of general frustrations with testing is believed to

have impacted her scores on the RIAS-2."

        92.      Ms. Abangma did not have authorization to test Student, but she tested Student

anyway.  Ms. Abangma unlawfully conducted assessments of Student, and her conduct and

evaluation report lacks ethics, deviates from norms, etc. including that Ms. Abangma refused to

report her own testing findings, which were consistent with Student's other assessments, if not

indicating even more significant findings.  In addition, Ms. Abangma relied on tainted and biased teacher reporting.  For example, Ms. Abangma used Ms. Charmaine White's student assessment, Student's Food and Nutrition Teacher, regarding adaptive skills, and these skills were reported by Ms. White as in the normal range.  Yet, in the fall of 2021, Kennedy Krieger Institute performed an adaptive skill's assessment, which showed Student's adaptive skills were below average.  Meanwhile, Ms. White, Mr. Rhonda Smith, English 11 and 12 teacher, and Ms. Clementine Mballa, who taught and/or oversaw the SAT Preparation class for math and language, an 11th grade class Student took this past academic year, and oversaw the numerous substitute teachers who taught Algebra II, were asked to provide references for Student, but they refused to respond and/or provide the references to date.

93.     Further, Student has generally scored higher in non-verbal IQ than reported by Ms. Abangma's report in December 2021; however, Ms. Abangma did not report her findings to explain the lack of consistency in prior data or why her findings differed from previous reporting.  Student's strengths to date have been in math and music, which are both non-verbal skills.  Finally, Ms. Abangma's reporting of adaptive skills in her December 2021 report rely on a teacher, Ms. White, that filled out a form indicating Student's adaptive skills to be in the typical range.  PGCPS' adaptive skill reporting, based on this particular teacher's assessment, etc. of Student apparently, is the only report that Student is aware of that does not put Student's adaptive skills in the very to extremely low range, usually less than the 1st percentile through present, and anyone who knows Student or works with her just a little can see immediately that Student's adaptive skills are in the very low range.  Again, this calls into question the testing methodology, findings, conclusions, training, credibility, professional ethics, competence, and motives of Ms. Abangma's and PGCPS' testing in December 2021, especially since the

additional testing being conducted by Ms. Abangma (and the IEP) was not needed but for Ms.

Abangma leading the IEP team to reject Student's private assessments around November 23,

2021, while Student was actively seeking non-public placement and additional education,

including life skills/independent living skills, for Student with PGCPS throughout that time. Ms.

Abangma's adaptive skills reporting suggests Student is in the typical range for the ill purpose of

making sure Student would not be eligible for additional services under the IDEA, including for

critical independent life skills and need for transition, to deny her a FAPE, interfere with

Student's rights, and, PGCPS, as a state actor, to obstruct access to state and federal benefits and

services as in individual with disabilities, especially when encouraging teachers and staff to

falsify reporting and/or fail to fill out forms needed for assessments used for these purposes.

94.     In approximately December 2021, Student was rejected from a small, private, all-

girls school of less than 100 students where she had applied to repeat the 11th grade because the

school could not accommodate her level of disabilities and skill sets. The schools that were

looked into could not accommodate Student, except the few that were specifically geared toward

Student's needs and disabilities.

95.     PGCPS again abruptly closed its schools from December 17, 2021 through

January 18, 2022, for the COVID-19 pandemic and resumed school virtually.

96.     On the winter 2021-2022 Measure of Academic Progress (MAP) reading testing,

Student scored a 186, in the 4th percentile, which was administered by Fusion Academy, a

private school, that offers 1-on-1 classroom in-person instruction. Fusion Academy was not able

to offer acceptance to Student in its high school programs, even at the 9th grade level, because

her reading skills were not in the middle school range, and she required remedial intervention,

which Fusion Academy does not provide, nor could it accommodate Student's severe reading and other disabilities.

97.     The final Triennial Evaluation dated January 28, 2022, reports Woodcock Johnson IV Achievement Standard Scores largely in the average range, with low or very low scores in Passage Comprehension (SS 74 Low), Reading Recall (SS <40 Very Low), and Sentence Writing Fluency (SS 66 Very Low).  Results reported in an assessment by Forward Thinking Assessment (Dr. Jennifer Nail) dated June 2021, indicated that Student struggled to generate meaning from written text, with performance below the 1st percentile on both the WIAT-4 and OWLS-II Reading Comprehension subtests, and she could not complete tasks that required pragmatic and higher-order language.

98.     A speech-language assessment was conducted by Deborah Watkis, CCC-SLP on December 13th, 2021, who administered the Comprehensive Assessment of Spoken Language-Second Ed (CASL).  Student's scores on the Idiomatic Language subtest showed "skills were solid up to the 11-year old level but began to splinter after that point and fell 13 to 14-year level as the items became more abstract."  Sentence Comprehension subtest showed Student's "level of functioning was solid through the 9-year-old level; however, beyond that level she was unable to discern which sentences had the same meanings and which did not.  As a result her performance on this subtest was found to be in the deficit range."  Student's ability to extract Meaning from Context was at the level of an 11-year-old.  The inference subtest was particularly challenging for Student; her performance was in the 6 to 7-year-old level,  placing her level of functioning in the deficient range."  Her score on the Pragmatic Language subtest put her performance at the 8 to 9-year-old level.

99.      During the December 21, 2021, and January 28, 2022, IEP team meetings to discuss Student's lack of progress, below-grade skill levels, need for additional in-person academic instruction and independent living skills training, Mother reiterated her deep concerns that Student was lacking certain functional living skills that required direct speech and OT and critical skills training services, and a more intensive placement. She requested Student receive at least one more year of school services. PGCPS dismissed Mother's concerns and unilaterally determined that Student was on track to graduate, should attend college for music and viola studies the following year, and did not require the additional services, instruction and training.

100.      Student was accepted into a PEERs social skills therapy class conditionally because the program's psychologist was very worried about Student's skills being too far behind the other teenagers in the program. Student completed the program, which began in February 2022, but her skills were severely and pervasively behind the other students.

101.      Student was accepted into the University of Maryland's Hearing and Speech Sciences Department (HESP) EFFECT program for executive functioning skills therapy in a group session for teenagers, which began in February 2022. Executive functioning skills therapy is considered an aspect of Applied Behavior Analysis designed for individuals with autism. Mother was looking for these support services for critical life skills to enroll Student because PGCPS failed to provide them.

102.      On February 7, 2022, Mother sent NHS the In-School Referral Form for the Department of Rehabilitative Services (DORS), the Developmental Disabilities Administration (DDA), etc., but PGCPS did not refer Student to these organizations despite Mother's repeated requests. On June 10, 2022, Ms. Toni Brooks emailed Mother in part: "We are still awaiting a response from DDA. She meets the criteria but the referral comes from the family." Mother

44

referred Student to both DDA and DORS because PGCPS did not.  Student qualified for services

from the DDA on August 22, 2022. Only people with the most severe disabilities qualify for

DDA services, and they are people who are determined to need substantial support as adults to

function effectively at home, in the community, and at work.  Student qualified for MetroAccess

due to her disabilities in March 2020.  In communications with PGCPS, Ms. Brooks stated that

Student did not have behavioral issues when the school knew at the time that Student was

displaying some big reactions, including to being told she would be spanked by her Spanish

substitute teacher if she did not turn in her assignment(s) and she started screaming in class after

being told that by her teacher.  Mother had also had multiple conversations with school

personnel, including the IEP team, that Student had become catatonic during COVID-19

pandemic school closures by summer 2020, and Student was displaying anxiety related

symptoms to perceiving and/or experiencing rejection.  This is another failure to child find as

individuals with autism can also have Autism Catatonia and Rejection Sensitive Dysphoria.

   103.   On March 7, 2022, the IEP team convened to discuss Student's lack of progress,

below-grade skill levels, need for additional in-person academic instruction and independent

living skills training, the impact of the COVID-19 pandemic through present, compensatory and

recovery services.  The team determined there was an educational impact on Student due to the

COVID-19 pandemic school closures and offered 200 hours of services at the Sheppard Pratt

School at the Oaklawn Secondary Program in Rockville beginning in July 2022, and 60 hours of

Lindamood-Bell instruction for 4-6 hours per day for 2-3 weeks.  Mother reiterated her request

for at least another year of school services in a nonpublic placement at the Katherine Thomas

School.  Mother also rejected the services offered, including because Student was already

scheduled to attend an intense summer program for music to make up for loss of music

education instruction before and during the COVID-19 pandemic, and subsequently, while she attended CVPA at SHS and VPA at NHS, and the school team again denied another school year of services, training, and instruction.

104.    The amended March 2022, IEP set goals and objectives in the areas of behavioral - social interaction skills, behavioral – self-management, reading comprehension, and written language content, and self-management.  Special education services remained the same with one (1) hour and thirty (30) minutes, five (5) days per week IGE, and added three (3) twenty (20) minute sessions of counseling monthly for anxiety.  Student was supposed to be granted a number of accommodations including use of laptop for assignments requiring extended writing, a copy of teacher/student notes, checks for understanding by having Student repeat or paraphrase information, repetition of directions, frequent breaks, extended time (double), visual supports, chunking of text, advanced preparation for schedule changes, use of checklists, visual reminders and task analyses, facilitate and monitor social interactions with peers during unstructured time, monitor use of class binder for organization, monitor use of agenda book, additional processing time, extra time for movement between classes, additional adult support, and monthly OT and SLP consultation.

105.    On May 26, 2022, NHS issued Student a "Merit Scholastic Award," which apparently meant that NHS and PGCPS was asserting Student was being issued a high school degree and placing her in the top 5% of all students in the State of Maryland.

106.    Student was assessed by a Lindamood-Bell Center in June 2022, which specializes in evidence-based programs for sensory-cognitive processing necessary for reading and comprehension.  Student's reading levels were determined to be critically remedial that LMB could not offer her group reading therapy sessions with other PGCPS students scheduled

over the summer at various PGCPS schools.  LMB stated that after one full year of intensive 6-hour daily 1-on-1 reading therapy that it was not certain that Student would achieve middle school level reading skills.  See also Paragraph 15 above.

107.    PGCPS required students to wear masks upon return to in-person learning throughout the school day through June 23, 2022, if not through present, which for Student was required to wear a mask from 8:15 to 5:15 daily, when she got on the bus in the morning and when she got off the bus in the afternoon.

108.    On May 31st, 2022, Student asked for a reasonable accommodation to be allowed to not wear a mask, provided supporting evidence related to the adverse impacts of mask wearing on students with language and other disabilities and a letter from a speech pathologist, etc.  PGCPS denied the request, but instead offered that Student could wear a face shield when she was not wearing a mask.  However, the face shield would be even bulkier and a greater impediment for her to access her FAPE, make Student stand out from her peers, be more difficult for her to endure wearing (on her skull versus over her face), present greater challenges for her motor coordination and lack of spatial awareness skills, it would not allow her to hear and understand her peers and teachers better but be likely worse, get dirty throughout the day for which she did not have the skills, tools, etc. to keep clean, and she could not use it all during her one to two music classes daily, 80 minutes each, where she was required to play the viola. Student was required to wear a mask from 8:15 in the morning when she got on the school bus until 5:15 in the evening when she got off the bus from school since returning to in-person learning.

109.    On June 1, 2022, Mother sent PGCPS a letter regarding Student's attendance at the high school graduation ceremony, seeking clarification, etc., discussing the cruel and

humiliating measures, that Student was scheduled to play in the orchestra for the ceremony, and that Student's presence was not a concession that she had been issued a diploma. This email was submitted into evidence for the January 2023 Motion to Dismiss Hearing.

110.    Mother received an official report from Student's attendance at the UMD EFFECT executive functioning group therapy class in approximately June 2022, which provides new information about Student's skill levels, and shows her scores as very clinically significant.

111.    Student attended CIP's two-week summer residential program for high school students with autism for life skills, social skills, and executive functioning skills training at the end of July 2022. Mother received a report from Student's attendance at CIP in August 2022, which provides new information about Student's low skill levels related to socialization, executive functioning, and independent living skills.

112.    Student learned in August 2022 that she had been blocked from her PGCPS student accounts, including email, communications, assignments, Google classroom, and so forth, which access should have been secured pursuant to the Stay Put Order request filed on May 10, 2022, in the due process complaint, despite a Stay Put Order. Student's PGCPS student account access needs to be immediately restored.

113.    There was newly discovered evidence around August 2022 that the Nurse, Principal, and others at Beltsville Academy, where student attended the Autism Program from Kindergarten through 2nd grade, heinously, repeatedly forced Student to remove her clothes, violated Student's privacy and body, vagina and anus, and invited many PGCPS staff to participate at will without the knowledge of Student's family when Student was still significantly non-verbal.

48

114.     PGCPS refused to agree to the temporary postponement, even though Student (who has co-morbidities and her family, including brother and grandmother (her mother's mother who has numerous very serious co-morbidities) who had been very ill with COVID-19 at the time the temporary postponement was sought while Mother was experiencing severe physical symptoms at the time, which have been documented as well.  PGPCS' actions were malicious and clearly not in Student's best interests but this further demonstrates PGCPS' true character and motive, especially given the devastating effects of COVID-19 school closures, etc. on Student for over 3 school years in the name of the students' and staff's safety, health, and well-being.  See Due Process Complaint throughout.  PGCPS has repeatedly acted in bad faith and with unclean hands.  This denial of a postponement by the OAH and PGCPS also constitutes failure to provide a reasonable accommodation, harassment, discrimination, retaliation, denial of due process, and so forth.

115.     On August 25, 2022, due to the egregious actions of PGCPS in MSDE-PGEO-OT-22-108884 throughout the proceedings and bias by the trier of fact, causing irreversible prejudice and harm resulting in a constructive mistrial, Student was forced to withdraw her initial due process filing of May 10, 2022, because of numerous serious factors, including herself being seriously ill from COVID-19, including two visits to urgent care on August 9, 2022, and August 25, 2022, and PGCPS' intentional, malicious acts to sabotage her request for postponement and perpetually corrupt the proceedings, like blocking Student from her PGCPS Student Accounts, gmail, Google classroom, etc. and failing to provide access to her records with a pending due process hearing.

116.     On September 29, 2022, one of two teachers who previously worked with Student, Ms. Suzanne Koch, indicated that she could not provide the teacher evaluations

requested by NeuroBehavioral Associates despite that she had already said she would, emailing: "Good morning [Mother], Please contact the Special Ed Department. Thanks very much". Student has not heard back from the other teacher reference, nor apparently did NeuroBehavioral Associates.  While these same teachers provided evaluations for the PGCPS evaluations conducted during 2021-2022, no teachers have provided responses for either private evaluation conducted on behalf of Student in 2021 and 2022, both referenced herein.  PGCPS is intentionally obstructing Student's ability to receive appropriate academic, life skills, vocational, etc. services, instruction, training, therapies, supports, insurance coverage, state and federally sponsored benefits, access to programs and accommodations, equal rights, due process, etc. for individuals with disabilities.

117.    PGCPS stated on October 13, 2022, that appropriate PGCPS staff had just reviewed Student's entire school records.  Mother followed up with Dr. Monica Goldson, CEO of PGCPS, on October 13, 2022, regarding the failure to provide Student's complete student records to date to Student, including through PGCPS administrative procedures (for example, the request for complete student records filed on September 18, 2022 through PGCPS) and the Maryland Public Information Act request filed July 31, 2022.  Parents are also entitled to access their students' records under the IDEA.

118.    PGCPS and Student, by their representatives, met on October 13, 2022, to discuss resolution, and PGCPS again offered 200 hours of services at the Sheppard Pratt School at the Oaklawn Secondary Program in Rockville beginning in July 2023, and 60 hours of Lindamood-Bell instruction for 4-6 hours per day for 2-3 weeks, virtually or in-person, without regard to whether the Oaklawn Secondary Program even has any availability, Student's unique needs, Student's priorities for summer programming in 2023 based on needs, and so forth.

50

119.    Due to PGCPS' malicious acts toward Student and her family for many years,
Student is not able to attend a local school, even non-public placement or post-graduate
programs, because of the severe damage caused PGCPS' malicious, unlawful, and tortious
interference, bullying, and other misconduct nor can these schools provide a free appropriate
public education that Student requires from a residential program.  PGCPS has unclean hands
and acts in bad faith as it knowingly created and perpetuates these circumstances.

120.    Since August 31, 2022, Student has received additional evaluation reports,
including from KKI, NeuroBehavioral Associates, and other providers.  Given Student's
pervasive disabilities, Student will need future evaluations to assess present skill levels to
determine necessary and appropriate supports, services, instruction, and training.

121.    Student received an evaluation from NeuroBehavioral Associates in October
2022 with results that are consistent with Dr. Nail's and PGCPS' psychological evaluations
conducted in 2021.  However, the results contained in this recently issued report provide new
evidence and data that serve as additional support for the claims and requested remedies in the
due process complaint, including for failure to provide a FAPE, etc. in 2nd grade, if not earlier,
and going forward, and for specific misrepresentations and failure to provide mandatory
disclosures.  Student's current school, Riverview School, provided reading comprehension
assessments that placed Student in the age 6/first grade reading comprehension level in October
2022, and additional data.

122.    Due to Student's low skill levels in independent living and academic skills being
so pervasively behind chronological grade and age and suffering from extreme regression during
COVID-19 pandemic school closures and other school disruptions, Student requires intensive

instruction for remedial support that a residential, non-public placement school and post-graduate programs for Student's disabilities can provide through at least age 26.

123.    Student has been attending Riverview School in Cape Cod, Massachusetts since mid-September 2022.  It is Mother's understanding the other students enrolled at Riverview School are funded by their school systems.  Mother took out a loan to fund Student's education at Riverview School pending the resolution of the due process complaint.  Riverview School is a residential, non-public placement school specially designed to serve students with Autism, intellectual disabilities, and complex language and learning disabilities, and provides training in academic, social, and independent living skills continuing through age 21, to enable students to reach their full educational potential through a multi-sensory, developmental, language-intensive curriculum.  https://www.riverviewschool.org

124.    In February 2023, as a resolution settlement proposal from PGCPS to Student for the December 2022 Complaint, offered the following:  "[p]rovide the student with reimbursement of documented out of pocket expenses incurred from tuition, college fees, and books for up to 18 credit hours for the Fall 2023 and Spring 2024 semesters at Prince George's Community College."  PGCPS has knowledge that Student has below 1% reading comprehension and cannot cross the street alone.

125.    Since at least 2011, Defendant, through its employees and/or agents, have disclosed private school matters and educational records to parties that are not privy to the information.  Mother has been stalked, recorded, scenes staged, etc. by school personnel with the intent to deny Student benefits under the IDEA, deny her access to her education, cause trauma to Mother and Student on the basis of their protected classes.  Mother has reported this behavior to public officials, offices, representatives as well as school officials.

126.     During virtual school due to pandemic closures, Mother witnessed Student become catatonic.  Among other pervasive circumstances Student was subjected to during CV-19 school closures, Student needs access to reading faces, and she could not do that virtually.  In addition, during Memorial Day Weekend 2020, the nature of her coursework and class lectures changes, or at least Mother became aware of it with Student attending virtual school.  Student was most often, if not almost exclusively, the only Caucasian, non-hispanic student in her classes throughout high school but who also had pervasive oral and written communications delays, disorders, and disabilities.  Her teachers in English, World History, Science, and other classes, focused on white supremacy/privilege discussions, even though it was not related to the subject matter being taught.  Student already struggled with communication and was completely scared to say or write anything, even if she had the skills, because she did not understand what was being discussed but was afraid of rejection, punishment, mistreatment, further isolation.  In world history class her junior year that was focused on Napolean, Marie Antoinette, her teacher(s) would discuss current events, labeling whole groups of Caucasian, non-hispanic individuals as white supremacists, while Student did not understand the nature and context of what was being said.  Assignments were geared toward determining political affiliation to make conclusions about the students (and their families) with respect to race, national origin, etc.  For example, one assignment for world history the teachers asked students to identify if they watched Fox News, MSNBC, or CNN, labeling them as conservative, neutral, and liberal news outlets respectively, with conservative allegedly code.  Student became scared at school and further withdrew from speaking and interacting with others.

127.     During Student's middle school and high school years while at KMS, SHS, and NHS, Student (and her younger brother also enrolled in PGCPS) would be assigned teachers

who self-proclaimed they had accents, and that when Mother tried to discuss Student's progress, assignments, etc., teachers would become hostile, etc., making sure to mention they were from a foreign country, making accusations that Mother did not hear them or understand them because of their accents, etc.  Having or referencing an accent has been code to denote that the individual is from outside the U.S., and thus this involves national origin.  Student's own family was kicked out of school in the 1930s and told not to return until and unless they learned English.  Further, Mother's step-father was born and raised in a country outside of the U.S.

128.    False rumors and gossip circulated since 2011 about Mother and Student regarding every protected class, including when Mother reported BA staff to CPS in spring 2012 for sex child abuse and notified many public and school officials.  Staff falsely manufacture narratives after that related to the actions at BA against Student, including that Mother was LBGT+ and when she talked to staff or students, she was hitting on them, regardless of gender or/and or their age, or worse.  Mother came to lunch at KMS to observe Student interacting with her peers, being concerned about her social interactions, and was asked by the security guard to get up from the table as she was not allowed to sit with students, nor talk to them.  This was harassment, discrimination, retaliation, etc. and it was based on false rumors and gossip regarding what occurred at BA to Student.  Female teachers at both Mother's childrens' schools would manufacture reasons for her to come to the school, or have phone conversations over the phone, even to record, watch, and/or listen her without her knowledge, which was sexual harassment.  These actions are heinous, as the women involved, including parents at some of their schools involved with the PTAs/PTOs were heterosexual.  Mother is heterosexual.

129.    Ms. Toni Brooks, Mr. Bryan Pierre, and others at NHS, emotionally and psychologically abused Student because of her age, disabilities, gender, etc.  PGCPS abused its

discretion, misused its police power, etc. to force Student to be subjected to graduation plans,

etc. and brainwashing her into believing that the only course for success for her was to be

playing the viola in college. Despite PGCPS' own data on Student's cognitive and other testing,

as well as Student's testing since 2021 through present, PGCPS offered Student as settlement for

Final Amended 2022 Complaint

130.    Because of Mother's and Student's actual/rumored national origin, race, and

color, false rumors and gossip pervasive for years spread that Motherthey held beliefs of Nazi,

white supremacists, etc. and would by definition then be against other religions, national origin,

and so forth.[12]   PGCPS staff knew that Student was Lutheran, which is generally linked to

German European Ancestry. Student's brother was targeted at the Talented and Gifted Program

on the basis of race, etc. falsifying math tests given to him but not to other students to cause poor

performance. These details have been provided at length to the OCR at the U.S.D.E. also, which

Mother understands is still in investigation.

131.    Mother was a well-respected advocate and community, then would be essentially

"hit on" by straight women when it was known she would be at the school, after care facilities

and/or summer camps, that were partnered with Defendant and often had staff in common while

---

[12] Student and Mother have been discriminated, harassed, etc. based on their ties to perceived/actual German ancestry as well as intersectional traits. Their family most recently comes from Germanic European areas, but once in Minnesota/Wisconsin territories, worked on farms, spoke German at home, in their churches and communities, which was their first and only language at the turn of the 20th century, as well as the farming communities in which they lived. Mother's aunt and uncle were sent home from school in the 1930s and told they could not attend school, until and unless, they learned English. See, for example,
https://www.history.com/news/anti-german-sentiment-wwi; https://themobmuseum.org/blog/world-war-played-key-role-passage-prohibition/; https://www.smithsonianmag.com/history/us-confiscated-half-billion-dollars-private-property-during-wwi-180952144/; https://www.smithsonianmag.com/history/how-woodrow-wilsons-propaganda-machine-changed-american-journalism-180963082/; https://www.npr.org/2017/04/07/523044253/during-world-war-i-u-s-government-propaganda-erased-german-culture;
https://en.wikipedia.org/wiki/German_language_in_the_United_States;
https://www.washingtonpost.com/history/2019/01/15/story-how-michael-king-jr-became-martin-luther-king-jr/; https://reimaginingmigration.org/the-anti-german-sentiment-of-world-war-i/;
https://www.theguardian.com/uk/2004/feb/06/race.usa; https://www.cnn.com/2018/10/16/us/eugenics-craze-america-pbs/index.html; https://en.wikipedia.org/wiki/Carrie_Buck [Retrieved April 11, 2023.]

there would be on-lookers, etc. to try to make the case Mother was LBGT+, etc. to support the false narrative created and perpetuated by school staff regarding what occurred at BA in 2011 and forward in an attempt to change the narrative from their own criminal and unlawful conduct. Mother also discussed racial motives, like a Board of Education Representative trying to recruit Mother to help fire a Caucasian female principal, as was occurring intentionally around 2011, in the State Complaint filed May 2013 against PGCPS.

132.    PGCPS staff were on common google/yahoo groups and other social media platforms, like Facebook and LinkedIn, and were apparently connecting with individuals from Mother's personal life and employer without her knowledge, and through associates in common.

133.    When Mother would email the Principal at her son's school, she would copy PGCPS Attorney(s), like Ms. Shauna Battle, or copy Mother's former husband, even after they divorced.

134.    False rumors and gossip were circulated that Mother had issues with mental stability, etc. Ms. Roslyn Turner emailed Mother and called her "delusional" and demanded Mother have Student removed from her 11th grade class of all IEP students, which communication Mother forwarded to the Board. This was approximately February 2021. Apparently, after this, Ms. Turner filed a Child Neglect form against Mother, to which Mother had no knowledge, citing that Mother discussed Student's disabilities. Ms. Turner's class was entirely IEP students, who by definition had disabilities. Advocating for Student and discussing her disabilities and abilities with teachers and school staff is not child abuse. Further, this conversation must have occurred virtually over Zoom, if it occurred, because PGCPS was still operating virtually at the time due to the pandemic. Actions like these with respect to the

56

protected bases were intended to discredit Mother, so her legitimate requests under the IDEA, etc. could be ignored.

135.    Ms. Turner emailed parent when Student first started at NHS in 10th grade, that student would be noted that she was out of uniform if she didn't have her school ID with her. Mother asked for an accommodation due to Student's disabilities, and Ms. Turner replied that IEPs do not apply to school IDs, accommodations, etc. did not apply to school IDs.  Mother had to elevate the matter to school officials.

136.    Mother repeatedly raised this type of conduct, mistreatment, bias, harassment, etc. to the Board of Education, Dr. Monica Goldson, Ms. Trinell Bowman and others, as well as externally, but the behavior continued.

137.    When PBES cut speech services from Student's IEP in 3rd grade, a compliance officer unannounced came to bully, threaten, etc. Ms. Fisher on the heels of Mother reporting BA staff to CPS, as well as discussing and filing a State Complaint about the same activities involving Student in May 2013.  When Mother would inform the Special Educator Chair at PBES that the speech pathologist was not providing services, Ms. Cleage copied Ms. Gail Viens, PGCPS Attorney, on the communications, to have chilling effects.

138.    During an IEP meeting during December 2021, Ms. Toni Brooks, who works directly with Ms. Trinell Bowman, said in a derogatory and disparaging tone, disgusted that Mother would seek to have Student attend a school with other disabled students when Mother was advocating for critical life skills training, socialization skills training, vocational training, and so forth, saying to the effect of: "you want her to attend a school with all disabled students?

139.    In Fall 2016, KMS refused to allow Student to join the orchestra class, even though she had played viola at PBES for the 2 prior school years, because they alleged she was too disabled.

140.    When Mother was trying to get Student into the orchestra class at KMS, she had a conference call with Principal Fahdli and Ms. Woodbury, Special Education Chair, without disclosing until about 10 minutes in the call that Attorney Shauna Battle was on the call listening.

141.    Student would not have been victimized at BA in 2011-2012 but for her disabilities, gender, and age.  PGCPS has engaged in false imprisonment with respect to Student frequently because of these protected traits, particularly disabilities, because Student does not understand she can say no or ask to leave or refuse to answer questions.

142.    PGCPS has discriminated against student's age because at all times through the unlawful termination of Student's IDEA benefits with the issuance of her diploma, Student was 17 years old and younger and could not consent, including to signing a form related to high school graduation requirements.

143.    PGCPS has abused its discretion, misused its police power, etc. and emotionally and psychologically tormented Student on the protected bases, especially disability because Student is highly suggestible and susceptible to peer pressure due to her disabilities.

144.    When Mother would ask for materials, assignments, information from teachers for Student, many would not respond to her, which became even more pervasive during the 2021-2022 academic year.

145.    PGCPS fraudulently and/or with material misrepresentations/omissions issued Student a high school diploma without Student having had the necessary coursework, skills,

completed the appropriate testing, etc.  For example, PGCPS stated in Student's March 2022

IEP that she had 12th grade reading comprehension when she has consistently tested since 2021

at much lower levels, including June 2023, that shows she is still in the less than 1% for reading

comprehension per Lindamood-Bell.

146.    PGCPS is a government actor and through its employees and agents continues to

be abusive, discriminatory, retaliatory, etc. to Mother and Student through present.  For

example, Mr. Krew, Defendant Attorney, will say openly in court and in communications to the

court that Mother is not competent/is incompetent, etc. and constantly and chronically belittles

her to the trier of fact unlawfully/inappropriately, to discredit her, having chilling effects.

147.    There is a crisis of women and girls with autism not being diagnosed at all or not

being diagnosed early enough for appropriate intervention.  Autism in females will present

differently than autism in males, where most of the studies and information have come from,

males with autism.  Females with autism value social skills differently than males so work hard

to fit in socially, being compliant behaviorally as compared to their male counterparts as to not

stand out. and are usually master parrots, repeating what they hear to give the impression they

understand what is being said or going on around them but in reality do not understand what is

going on around them.  Student is a master parrot, and PGCPS knows this or should know this

about her disabilities and diagnosis.  For one example, PGCPS Attorney asked Mr. Barton

during the Motion to Dismiss Hearing on January 27, 2023, if Student appeared/seemed

disabled, to which he replied no.

148.    PGCPS' conduct shocks the conscience.  PGCPS, through its lawyers, agents,

and employees, make false statements, make material misrepresentations/omissions, inaccurate

statements, miscite/misapply the law to trick the trier of fact, etc.

149.    Defendant continues to target Plaintiff because of and on the bases of protected classes, and subject them to harassment, a hostile environment in proceedings through its employees and/or agents, and adverse actions, as well as created an extremely toxic and dangerous environment for Student.

150.    Defendant's numerous adverse actions against Plaintiff has caused, and continues to cause, economic loss, pain and suffering, and humiliation.

Defendant's created and perpetuated hostile environment has caused, and continues to cause, Plaintiff to suffer economic loss, pain and suffering, and humiliation.

## **CLAIMS**

151.    PGCPS failed to offer the Student a FAPE during the school years from August 2011 through present, if not earlier.

152.    PGCPS failed to offer the Student a FAPE by not providing special education to the Student during the school years between August 2011 through present, if not earlier.

153.    PGCPS failed to offer the Student a FAPE by failing to evaluate and identify suspected disabilities and corresponding need for additional special education during the school years between August 2011 through present, if not earlier.

154.    PGCPS failed to offer the Student a FAPE by failing to provide a sufficient and appropriate Individualized Education Program (IEP) to assist the Student in making appropriate learning progress during the school years between August 2011 through present, if not earlier.

155.    PGCPS failed to offer the Student a FAPE by failing to implement the IEP that was in place to assist the Student in making appropriate learning progress during the school years between August 2011 through present, if not earlier.

156.    PGCPS failed to offer the Student a FAPE by not providing the related services required, if not included in special education described in Item 2 above under Issues, such as speech therapy, occupational therapy, assistive technology, adaptive physical education, and counseling, as a result of its failing to provide a sufficient and appropriate IEP to assist the Student in making appropriate learning progress during the school years August 2011 through present, if not earlier.

157.    PGCPS failed to offer the Student a FAPE by not providing appropriate transition-related services during the school years between August 2011 through present, if not earlier, as required.

158.    PGCPS failed to provide the Student a FAPE by not providing appropriate transportation services during the school years between August 2011 through present, if not earlier, as required.

159.    PGCPS failed to provide a Student a FAPE by not providing appropriate modifications, etc. that prevented Student from accessing her music education at the performing arts program.

160.    PGCPS failed to provide the Student a FAPE by mistreating Student and her mother, Mother, including acting with malice, interfering with other aspects of their lives, and creating and perpetuating a hostile school environment during the school years August 2011 through present, if not earlier.

161.     PGCPS failed to provide Student a FAPE by not providing sufficient compensatory, recovery, declaratory, remedial, and other services due lack of special education providers, lack of required resources, lack of highly qualified individuals, lack of trained staff, etc. during the school years August 2011 through present, if not earlier.

162.     PGCPS failed to provide Student a FAPE by not providing sufficient compensatory, recovery, declaratory, remedial, and other services due to the COVD-19 pandemic school closures and other school disruptions during the school years between March 2020 through present.

163.     PGCPS failed to provide Student a FAPE by failing to follow mandatory Stay Put requirements as of May 10, 2022, including proceeding with an exit interview for graduation without Mother or Student present, without consent, proceeded to issue Student a high school diploma unilaterally and without being fully aligned with the State's academic standards, even though it is an issue in a due process hearing, did not provide Student's continuing access to her PGCPS Student Accounts for email, Google classroom, etc., and eliminated her benefits under the IDEA.[13]

164.     PGCPS failed to provide Student a FAPE by failing to provide access to her student records during the school years August 2011 through present, if not earlier, including access to her Student Accounts, email communications, Google classroom, Gmail, etc., and her complete school record as requested numerous times, etc. through present

---

[13] Student did not authorize the issuance of the diploma, nor did Student's Attorney at the time.  The Exit Interview was held on May 9, 2022, and Student filed for due process on May 10, 2022 (the May 2022 Complaint) requesting Stay Put.

165.    PGCPS failed to provide Student a FAPE by making specific misrepresentations and by withholding statutorily mandated disclosures under 20 U.S.C. § 1415(f)(3)(D) during the school years at issue, if not earlier.

166.    Student and Mother were subjected to prohibited disparate treatment and an unlawful hostile environment, including harassment, based on including but not limited to the following actual, perceived, and/or rumored bases:  including on but not limited to the following actual, perceived, and/or rumored bases:  age (YOB: 1971 and 2004), disabilities (physical, mental, medical conditions, disability stereotyping, caregiver of individual with disabilities), national origin/ancestry/ethnic background (Scandinavian/Germanic European/Other European/etc., stereotyping), race (Caucasian, stereotyping), sex (female, sex stereotyping, sexual orientation, caregiver of individual with disabilities), color (fair-complexioned/white, blue eyes, blonde hair, stereotyping), altering the terms, conditions, and privileges that are associated with a free appropriate public education, such as continuing violation doctrine, by Title VI of the Civil Rights Act of 1964; Title IX of the Education Amendments of 1972; Section 504 of the Rehabilitation Act of 1973; Age Discrimination Act of 1975; Title II of the Americans with Disabilities Act of 1990; the U.S. Constitution, including due process and equal protection; 42 U.S.C. § 1983; Individuals in Education Act, 20 U.S.C. § 1400 and § 1414, and equitable doctrines.

167.    Chronic and pervasive false rumors and gossip creates liability under discrimination principles, as well as can constitute bullying.  The DOL and OSHA have referred to chronic and pervasive false rumors and gossip as Level 1 Violence.  It further results in denial of due process when the false rumors and gossip are taken for the truth of the matter asserted without opportunity to face the accusers to address the false rumors and gossip, etc.

168.   PGCPS' actions with respect to Mother and Student shock the conscience and deny equal protection under the law.

169.   The Court's actions of not allowing Student to present their case denies equal protection under the law and substantive due process.  The Court violated Student's constitutional rights when it denied her substantive due process and deprived her of her rights by not allowing her to present evidence, examine witnesses, etc. with respect to her IDEA claims.

170.   PGCPS violated Student's constitutional rights for an unlawful search and seizure when Ms. Abangma tested Student without authorization and then manipulated the results to use against Mother and Student which then has been referenced and sent to two different triers of fact.

171.   Having 10 (or more) staff at BA repeatedly ask Student to take off her pants and look at/touch her vagina, labia, and anus, then minor female with disabilities, constitutes an unlawful search, discrimination, misuse of authority, criminal abuse, abuse of discretion, false imprisonment, etc.  Student was under the care of multiple doctors, and PGCPS did not have authority, authorization, or cause to repeatedly violate Student.

172.   The Court violated Student's constitutional rights when it denied her due process and equal protection by holding bias, having improper motives, such as clearing a calendar, with respect to the disposition of the case.  Mr. Krew, PGCPS Attorney, made comments during the January 27, and January 30, 2023, Hearing to suggest that Student's case was going to break the record for the longest trial in OAH history.

173.   The Court erred by not allowing Student to have an impartial hearing under the IDEA for the Final Amended Complaint 2023 and by failure to give deference to U.S.D.E. OSEP POLICY LETTER 22-04: April 15, 2022, to Zirkel, states in part: "[w]henever a due

process complaint is received under 34 C.F.R. §§ 300.507 or 300.532, the parents or the local educational agency involved in the dispute must have an opportunity for an impartial due process hearing, consistent with the procedures in 34 C.F.R. §§ 300.507, 300.508, and 300.510. 34 C.F.R. § 300.511(a). Among the rights IDEA affords parties to any hearing conducted pursuant to §§ 300.507 through 300.513 or §§ 300.530 through 300.534, or an appeal conducted pursuant to § 300.514, is the right to present evidence and confront, cross-examine, and compel the attendance of witnesses. 34 C.F.R. § 300.512(a)(2).  IDEA does not address procedures for dismissal of due process hearing requests outside of the context of the sufficiency of the complaint. In other words, the only provision in IDEA or its implementing regulations that contemplates summary dismissal is when the due process complaint is insufficient."

174.    The Court erred in not giving deference to the U.S.D.E. with regulatory and implementation authority of the IDEA, including in guidance, such as OSEP POLICY LETTER 22-04: April 15, 2022, to Zirkel, that specifically addresses substantive due process under the 14th amendment and under the IDEA.  The Letter states in part:  "[t]o the extent any summary proceedings in a hearing on a due process complaint — other than a sufficiency determination — limit, or conflict with, either party's rights, including the right to present evidence and confront, cross-examine, and compel the attendance of witnesses, we believe such proceedings can be used only when both parties consent to use the summary process (e.g., cross-motions for summary judgment)."  PGCPS was not entitled to a Motion for Summary Decision because Student did not consent to summary proceedings.  Student repeatedly objected to the Motion's Hearing on these grounds.

175.    The Court erred in not holding a hearing on the merits because Student was unable to subpoena witnesses for the Motion to Dismiss Hearing conducted at the end of January 2023.

176.     The Court erred by allowing PGCPS to pursue its Motion to Dismiss well after 15 days after receipt of the August 2022 Complaint had lapsed (as well as from receipt of the October 2022 Amended Complaint) to challenge the sufficiency of both complaints under the IDEA.  See also OSEP POLICY LETTER 22-04: April 15, 2022, to Zirkel.[14]

177.     The Court erred in not requiring PGCPS to respond to Student's August 2022 Complaint and Final Amended Complaint pursuant to the IDEA prior to the Motion's Hearing in January 2023, a statutory requirement under the IDEA, for example, to be put on notice of PGCPS' position on Student's claims.

178.     The Court erred in proceeding with hearing for PGCPS' Motion to Dismiss without Student having obtain access to her Complete Student Records, including access to school email and Google classroom accounts, which Student has still not been provided. Student could not properly defend against to the Motion to Dismiss without having access to these records, including what the requirements were for each course Student took, syllabus, etc.

179.     The Court erred by excluding relevant data and assessments from the record.  For example, the Court refused to acknowledge the relevance, evidentiary value, and significance of introducing assessments from an occupational therapist group that discussed Student's life skills, or an evaluation from a vocational program that Student attended for high school students with autism that worked on social skills, life skills, etc.

180.     The Court erred in considering the assessments of professionals and other documents for the truth of the matter asserted without allowing testimony from those experts and/or regarding the records admitted into evidence.

---

[14] Student notes that PGCPS did not file its Motion to Dismiss until more than 60 days after the August 2022 Complaint was filed.

181.   The Court erred in not allowing Mother to finish testifying in the January 2023 Motion to Dismiss Hearing, and to present other witnesses, and then relied solely on her initial, brief, incomplete testimony as basis to support the granting of PGCPS' Motion to Dismiss.  This also departs from the parameters set for the Motion to Dismiss Hearing in the December 28, 2022, Letter and from the December 21, 2022, Pre-Conference Hearing, when the parties were told they could provide any additional evidence and arguments in support of their positions at that hearing.

182.   The Court erred in stating that Mother conceded that Student had met the high school graduation requirements.  Student's transcript does not contain assessments that were required to be taken.  In addition, Student did not have the necessary information to address whether the courses met State academic standards through a Document Production Request that was foreclosed due to the abrupt change in scheduled and that PGCPS had not provided Student's Complete Records, including access to Google Classroom, etc. by that time.

183.   The Court erred in holding that the mere issuance of the diploma based on completion of a certain number of hours and courses is the standard for determining when FAPE ends without regard to whether it was fully aligned with the State's academic standards and if proficiency in basic skills had been met.

184.   The Court erred by failing to consider the specific disabilities of the Student, including a female student with autism, and that the full extent of the disabilities or associated disabilities can be overlooked/ignored by school systems, in this case PGCPS, until high school years or later.  An interpretation that supports denying female students with autism benefits because they are diagnosed late(r) and a high school diploma has been issued or is close to being issued is inconsistent with the equal protection clause, results in disparate treatment and impact, etc. These actions constitute the wrongful cessation of benefits under the IDEA.  The Court

erred when on January 6, 2023, abruptly changing the Motion to Dismiss hearing scheduled for February 21, 2023, to January 27, 2023, thus eliminating the opportunity for Student to file a Request for Document Production prior to 30 days before the Hearing. This abrupt change in schedule also impaired Student's ability to secure necessary witnesses, without subpoena authority, on such short notice. This also deviated from the hearing and pre-hearing conference schedules provided in the December 28, 2022, and January 6, 2023, Letters suggesting that there would be a full hearing on the merits after February 21, 2023.

185.    The Court erred in holding that issuing a high school diploma makes moot FAPE violations. Whether a student ages out or is issued a diploma that results in being denied future benefits under the IDEA does not make moot FAPE violations that occurred before the student is issued a diploma or ages out. Student's Complaint raises allegations of FAPE violations dating back to 2nd grade, the 2011-2012 academic year, and these claims are not made moot because PGCPS issued Student a diploma in June 2022.

186.    The Court erred in concluding numerous "undisputed material facts", including but not limited to, 1) Student did file a 5-day discovery of witness lists[15]; 2) Student attended SHS as well as NHS during her chronological 9th through 12th grade years; 3) Mother testified on behalf of herself and Student, however, Student was also scheduled to testify.

---

[15] Further, once PGCPS would have provided Student's Complete Student Records, including access to school email and Google classroom accounts, ordered immediately by Judge Henderson on August 24, 2023, Student would have sought to introduce the relevant evidence as newly obtained, assuming PGCPS would have supplied it during the course of the Hearing. Further, Student's speech evaluation and neuropsych evaluations had been provided to PGCPS previously and portions had been incorporated into the May 2022 Complaint, Student's IEP, as well as PGCPS Assessments. However, Student also filed a Motion for Reinstatement into her school email and Student accounts, like Google classroom, to be able to compile relevant documents, to use as Exhibits on August 15, 2022. This access has not been restored to date.

187.    Through the forgoing actions, Defendant subjected Student to a hostile environment, adverse actions, discrimination, and retaliation, because of the protected bases systemically and institutionally as well as being individually targeted.

188.    Plaintiff realleges and incorporates by reference all of the allegations set forth above.

189.    These practices by Defendant constitute discrimination, harassment, and retaliation on the basis of each protected class identified in the foregoing under.

### INVOCATION OF ADMINISTRATIVE REMEDIES/EXHAUSTION

190.    This Complaint is filed within 120 days of the Summary Judgment decision issued February 23, 2023, in OAH No.:  MSDE-PGEO-OT-22-21157.

191.    With respect to the discrimination, retaliation, harassment, adverse actions, and whistleblower claims, the adverse actions and gross mistreatment has been on-going since at least 2011 against Student and Mother, both of whom have active cases open against PGCPS through the U.S. Department of Education Office of Civil Rights, which were filed on June 9, 2022.

### PROPOSED IDEA REMEDIES

192.    Plaintiffs requested as proposed remedies the following:  that the ALJ: (1) FIND PGCPS failed to provide a FAPE from at least August 2011 through present including during the COVID-19 pandemic, and offer compensatory, recovery, declaratory, and other remedies and services to the Student; (2) FIND PGCPS did not maintain the Student's eligibility for special education and other services related to academic, critical life skills, transition, and other instruction through age of 21 and provide placement in a private, separate residential school

designed to address her unique disability-related needs, including intensive support for remedial skills, for high school and transition/vocation/career/music/education, other skills programs, instruction and training; (3) FIND PGCPS failed to provide a FAPE and compensatory, recovery, declaratory, and other remedial services to make student whole, and cover the full costs of providing post-graduate, transition/vocation/career/music/education, other skills programs, instruction and training, such as described in Item (2) as required and appropriate for Student through at least age 26; (4) FIND PGCPS failed to provide a FAPE and compensatory, recovery, declaratory, and other remedial services and provide additional life skills, social skills, executive function skills, transition/vocation/career/music/education, other skills programs, training and instruction, and other relief for Student through at least age 26 to make student whole; (5) FIND PGCPS failed to provide a FAPE and compensatory, recovery, declaratory, and other remedial services for Student's reading and related disabilities and provide for Lindamood-Bell reading instruction (or its equivalent) until Student obtains 12th grade reading levels; (6) ORDER Stay Put regarding Student's graduation status from PGCPS, including continuing to provide access to Student's PGCPS Student Accounts, like email and Google Classroom, and restore benefits under the IDEA; (7) ORDER distribution to Student of her Complete Student Records from PGCPS; and (8) ORDER PGCPS to provide payment of/reimbursement for fees for attorneys, experts, advocates, etc., costs, compensation, assessments, testing, reports, medical bills, such as co-payments, related services paid out of pocket, tutoring, program fees and costs, tuition, classes, therapy, training, travel expenses, transportation, and similar or related expenses; (9) ORDER any other relief as appropriate.  Student also reserved the right to seek additional remedies and relief as appropriate.

**PRAYER FOR RELIEF**

a.  Award additional time for Student to provide more information related to this Complaint;[16]

b.  Vacate the decision of the lower Court that the Student is no longer eligible for IDEA benefits by virtue of the issuance of the a high school diploma and that the act of issuing the high school diploma by PGCPS makes moot all claims related to FAPE;

c.  Award a hearing on the merits and discovery;

d.  Award compensatory damages;

e.  Award punitive damages;

f.  Award damages and equitable relief for all harm Plaintiff has suffered as a result of Defendant's unlawful conduct, including education benefits Student should have received but was denied but for Defendant's unlawful conduct;

g.  Award proposed IDEA and other remedies and equitable relief;

h.  Award any out-of-pocket expenses incurred as a result of Defendant's unlawful conduct;

i.  Award reasonable attorneys' fees, costs, and expenses incurred for this action;

j.  Require training for the officials named herein;

k.  Award equitable, declaratory, and injunctive relief; and

l.  Award such other and further relief as this Honorable Court deems just and proper.

---

[16] Mother has been extremely sick and also has been suffering from excruciating pain in her neck and back related to long-term computer use and sitting too long in front of a computer, and gets migraines, blurred vision, dry eyes, nauseous, sharp shooting pain in her neck and back from osteoarthritis (wear and tear arthritis) and herniated, bulging cervical spine discs, among numerous other serious health issues.

**WHEREFORE**, Plaintiff respectfully prays that this Honorable Court:

a.      Order the Defendant to institute a policy and procedure advising its employees and agents about anti-discrimination and IDEA laws and implementing enforcement mechanisms;

b.      Order training for Defendant and the officials at issue herein;

c.      Award such other and further relief as this Honorable Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury for all claims which may be so tried.

## CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information and belief that this Complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Dated:  June 22, 2023                    Respectfully submitted,


By:     _____
        Kari Fisher, Plaintiff *Pro Se*, and on behalf
        of K.F., with POA
        2508 Heatherwood Court
        Adelphi, MD 20783
        Telephone: (301) 996-8523
        Email: karifisher7@gmail.com